

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-8-2007

# Green v. Fornario

Precedential or Non-Precedential: Precedential

Docket No. 06-2649

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Green v. Fornario" (2007). *2007 Decisions.* Paper 1036.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1036

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 06-2649
_____

TYLER GREEN,

Appellant

v.

GREG FORNARIO;
TYLER GREEN SPORTS

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 04-cv-01159)
District Judge: Honorable Robert F. Kelly

_____

Submitted Under Third Circuit LAR 34.1(a)
April 23, 2007

Before: McKEE and AMBRO, <u>Circuit Judges</u>
ACKERMAN,[*] <u>District Judge</u>

(Opinion filed  May 8, 2007)

John M. Elliott, Esquire
John P. Elliott, Esquire
Elliott, Greenleaf, and Siezikowski, P.C.
925 Harvest Drive
Union Meeting Corporate Center V, Suite 300
Blue Bell, Pennsylvania 19422

    Counsel for Appellant

Gregory M. Castaldo, Esquire
Schiffrin & Barroway, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087

    Counsel for Appellees

OPINION OF THE COURT

AMBRO, <u>Circuit Judge</u>

---

[*]Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey, sitting by designation.

We decide whether the District Court abused its discretion in declining to award attorneys' fees to a prevailing party in an unfair competition suit. This is a discretionary decision, and it turns on whether the Court believes that the case is, in the words of the Lanham Act, "exceptional." In holding that the Court did not abuse its discretion here, we emphasize that the term "exceptional" is not, as the plaintiff seems to suggest, a throwaway. Rather, it calls for a district court to determine whether it finds a defendant's conduct particularly culpable—enough to alter the general American rule that parties to litigation pay their own attorneys' fees. We therefore affirm.

## I. Facts and Procedural History

### A. Tyler Green

Tyler Green is a former pitcher for the Philadelphia Phillies. He was drafted by the Phillies in 1991—the tenth overall pick—following a stellar college career at Wichita State University that included two College World Series appearances. After spending just one year with its Triple-A farm team, Green joined the Phillies for the 1993 season. Plagued by injuries from the get-go, Green was able to play only three full seasons in the Major Leagues. The apex of his career was a 1995 trip to the All Star Game.

Following his retirement from professional baseball in 2000, Green has stayed in the Philadelphia area. He is the

pitching coach for the nationally acclaimed Germantown Academy varsity baseball team. Local media have covered his coaching work extensively. In addition, he regularly appears on regional television and radio baseball programs, and he participates in a variety of Phillies-related charitable events. From this evidence, Green no doubt retains some name recognition in the greater Philadelphia community.

### B.    Greg Fornario and Tyler Green Sports

Greg Fornario ran a business called Tyler Green Sports. A former bartender at a Philadelphia-area sports bar, Fornario decided in the late 1990s to start a sports handicapping business. Handicappers are the stock analysts of the sports gambling world: they provide information to sports bettors. According to Fornario, he saw this as an easy way to make money, and so he acquired an 800 number, took out an ad in the paper, and waited for the calls to come in. There was a mix-up, however, with his 800 number, and so he discontinued the business after running the advertisement for only one day. He had no financing and was in no position to advance the business additional money from his personal assets.

Fornario did, however, market this short-lived venture as Tyler Green Sports. He testified that the business was never affiliated with anyone named Tyler or Green. Rather, he purportedly came up with "Green" because handicapping businesses, he said, typically have some reference to money in

their names.  Green is, of course, the color of money, so it fit. Fornario then tried to come up with something "catchy" to put with Green.  He settled on Tyler, he claimed, because he is an Aerosmith fan, and Stephen Tyler is the group's lead singer. Thus, Tyler Green Sports.  He testified that at the time he had never heard of Tyler Green the baseball player.  He admitted, however, to being a fan of all sports except hockey.  The Philadelphia teams have no allure for him, as he is a New York native.  He described himself as a "diehard" Yankees fan. While all of this is more than a mite shaky, it is Fornario's story, and he is sticking to it.

In 2000, Fornario, his handicapping business long defunct, resumed using the name Tyler Green Sports in trade. This time, he used it as the name of an entertainment promotion company.  Specifically, the company made money by coming up with event ideas, putting them together, and selling them to venues.  For example, it promoted a number of Philadelphia Eagles' pep rallies by lining up player appearances, taking care of decorations and advertising, and selling the pre-packaged events to sports bars.  It also did traditional party planning.  The company used the website http:///www.tylergreensports.com to advertise its services.  Fornario incorporated the company in Pennsylvania, and registered to it the name Tyler Green Sports. Before registering the name, he testified that he engaged an attorney to do a trademark search.  According to Fornario, this search revealed that the name Tyler Green Sports was not registered to any business or person.  Tyler Green Sports never

achieved significant commercial success.

## C. This Litigation

In October 2003 Tyler Green's agent Rex Gary discovered that a local business was using the name Tyler Green Sports. After investigating its activities, he phoned the company and spoke to Fornario. He confirmed that the business was not affiliated with anyone named Tyler or Green, and on that basis demanded that Fornario cease trading under the name. When Fornario declined, Green's attorneys sent formal cease and desist letters in February and March 2004.[1] Following the

[1] While cease and desist letters are understandably neither warm nor friendly, we cannot help but note that Green's were particularly combative. For example, in his February 20, 2004, letter, Green's counsel advised Fornario that he would "refer[] [Fornario's] conduct to the appropriate criminal authorities." This is curious, as the Lanham Act is a purely civil statute. There is a parallel criminal counterfeiting statute, but to be "counterfeit" a mark must be similar to a registered trademark. 18 U.S.C. § 2320(e)(1)(A)(ii). Here, no registered trademark is involved. To be sure, unfair competition is a serious tort, but we see nothing in this record that approaches criminal conduct, nor do we see any evidence that Green's counsel followed up (or had any intention of following up) on this threat. It is worth noting that lawyers should take threatening criminal prosecution—particularly in a letter to an uncounseled individual—very seriously. To do so where no criminal reference is objectively possible or subjectively contemplated is

second letter, Fornario offered to stop using the name in return for $3,000. According to Green's attorneys, Fornario represented that this figure corresponded with the money he had spent on Tyler Green Sports-labeled merchandise. Fornario, on the other hand, contends that it was merely an opening settlement offer. The evidence shows that Fornario did not spend even ten percent of that amount on merchandise. Green balked at the offer and filed suit in the District Court.

In his answer, Fornario denied liability and asserted a counterclaim of libel against Green and his attorneys. Specifically, Fornario alleged that accusing him in the February 2004 letter of using Tyler Green's name to "sell alcohol and sex" libelously insinuated that he was involved in, to be euphamistic, "Mrs. Warren's profession."[2] Green responded with a Rule 11 motion, and Fornario withdrew the counterclaim. Within two weeks of the answer, Fornario signed a consent decree in which he agreed to stop using the name Tyler Green in trade. The action continued on the issues of damages, costs,

---

a most unwise tactic. *See* Philadelphia Bar Ass'n Prof'l Guidance Comm., Guidance Inquiry No. 89-17, 1989 WL 253283 (Sept. 1989) (discussing danger of threatening uncounseled individual with criminal prosecution under Pennsylvania professional ethics code).

[2] *See generally* GEORGE BERNARD SHAW, MRS. WARREN'S PROFESSION (William-Alan Landes, ed., Players Press 1991) (1893).

and attorneys' fees.

Green proceeded with discovery, but his efforts trailed off, and the District Court dismissed the case for failure to prosecute in January 2006. On Green's motion, the Court reinstated it and, on the basis of the record evidence, awarded costs. The Court refused, however, to award attorneys' fees, and Green appeals that denial to us.[3]

## II.    Whether This Case Is Exceptional

Though best-known as the law that regulates trademark infringement, the Lanham Act, 15 U.S.C. §§ 1051–1141, also prohibits other forms of unfair competition.[4] Specifically, § 1125 creates civil liability for misdescribing goods in commerce, importing mislabeled goods, diluting the value of a famous mark, and cybersquatting.[5] 15 U.S.C. § 1125(a)–(d).

---

[3] The District Court had jurisdiction under 28 U.S.C. § 1331. Our jurisdiction is based on 28 U.S.C. § 1291.

[4] The initial version of the Lanham Act, Pub. L. No. 87-772, 76 Stat. 769 (1946), did not provide for all of these causes of action. In keeping with general use, however, we use the term "Lanham Act" to refer collectively to it and its subsequent amendments.

[5] In general, cybersquatting is the act of registering, in bad faith and to garner profit, on the internet a domain name so

8

Here, Green asserted claims of misdescription, dilution, and cybersquatting.

The Lanham Act allows a prevailing plaintiff to recover costs, along with damages and profits, as a matter of course. 15 U.S.C. § 1117(a). But it allows a recovery of attorneys' fees only in "exceptional" cases. 15 U.S.C. § 1117(a) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party.").

Determining whether a case is exceptional is a two-step process. First, the District Court must decide whether the defendant engaged in any culpable conduct. *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.*, 952 F.2d 44, 47 (3d Cir. 1991). We have listed bad faith, fraud, malice, and knowing infringement as non-exclusive examples of the sort of culpable conduct that could support a fee award. *Id.*; *see also Securacomm*

---

similar to a distinctive mark that it is confusing. A popular subgenera of cybersquatting—termed typosquatting—involves registering a domain name that is but a letter or two off from a distinctive mark (*e.g.*, registering http://www.yhoo.com to catch people mistyping the popular search engine http://www.yahoo.com). *See generally Shields v. Zuccarini*, 254 F.3d 476 (3d Cir. 2001) (providing an overview of the Lanham Act's prohibition of cybersquatting); Christopher G. Clark, The Truth in Domain Names Act of 2003 and a Preventative Measure To Combat Typosquatting, 89 CORNELL L. REV. 1476 (2004).

*Consulting, Inc. v. Securacom, Inc.*, 224 F.3d 273, 280 (3d Cir. 2000). Moreover, the culpable conduct may relate not only to the circumstances of the Lanham Act violation, but also to the way the losing party handled himself during the litigation. *Securacomm*, 224 F.3d at 282. Second, if the District Court finds culpable conduct, it must decide whether the circumstances are "exceptional" enough to warrant a fee award. *See Ferrero*, 952 F.2d at 49 (noting that the court may consider factors other than the defendant's culpable conduct, such as the closeness of the liability question and whether the plaintiff suffered damages). In sum, a district court may not award fees without a finding of culpable conduct, but it may decline to award them despite a finding of culpable conduct based on the totality of the circumstances.

Here, Green alleges two basic categories of culpable conduct: (1) Fornario's knowing infringement, and (2) his bad-faith failure to stop at Green's request. We deal with each in turn.

## A.    Knowing Infringement

Green alleges that Fornario knew his name and intentionally used it to profit from Green's goodwill. Fornario, of course, denies this, and in its Memorandum Opinion the District Court was unwilling to infer Fornario's culpable knowledge and intent from Green's regional recognition. That Fornario did not intentionally trade on Green's name is a finding

10

of fact, so we can overturn it if it is clearly erroneous. *See ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 971 (D.C. Cir. 1990). Under that standard, we only set aside factual findings when we are "'left with the definite and firm conviction that a mistake has been committed.'" *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948)). In addition, it is worth noting that Green, like any civil plaintiff, bears the burden of proving culpable conduct as a necessary element of establishing that he is eligible for a fee award.

At the time that he began using the trade name Tyler Green Sports, Fornario had lived in the Phildelphia area for at least five years and had spent considerable time around sports as a fan, a bartender in a sports bar, and a nascent handicapper. From this, he seems the sort of person who would know of a pitcher on the Phillies' team. Still, finding that he knew of Green is not compelled by this record. Doing so here would require discrediting Fornario's testimony and deciding that Green was famous enough that Fornario could not but know of him. While Tyler Green was known regionally in his short career and his post-retirement work continues to garner some attention, we cannot conclude that the record evidence of his recognition means that Fornario must have known of him. Because the District Court's resolution of this disputed issue of fact was not clearly erroneous, we cannot disturb it notwithstanding our suspicions about Fornario's explanation for

11

his trade name.

## B.    Bad Faith Refusal To Cease and Desist

A defendant's refusal to comply with cease and desist letters in bad faith is no doubt a legitimate means of establishing an "exceptional" case.  In general, putative defendants have every right to decline pre-litigation requests without adverse consequences, but they must do so in good faith—that is, believing that they have a colorable claim of right to engage in the challenged behavior.  *See Northern Light Tech., Inc. v. Northern Lights Club*, 236 F.3d 57, 65 (1st Cir. 2001) (approving district court's use of defendant's disregard of legitimate cease and desist letters as evidence of bad faith).  Thus, did Fornario decline to stop using Green's name knowing that he had no right to use it, thereby wilfully refusing to comply with the law?  This is a question of Fornario's subjective state of mind.  *See Bishop v. Equinox Intern. Corp.*, 154 F.3d 1220, 1224 (10th Cir. 1998) (evaluating whether defendant subjectively believed plaintiff had abandoned trademark before using it in commerce).  There is, as usual, no direct evidence of Fornario's bad state of mind, so the District Court would have had to infer bad faith from the surrounding circumstances, and, here again, it declined to do so.  It ruled instead that Fornario's conduct was equally consistent with the belief that his use of the trade name was legitimate.

Was that finding clearly erroneous?  Boiled down,

12

Green's argument seems to be that Fornario had no arguable defense to his Lanham Act claims; thus, from the facts that (1) Green alerted Fornario to his objections and (2) Fornario did nothing, the Court should have inferred bad faith. To analyze that argument, we must consider, as best we can on a limited record, the strength of Green's claims.  It is important to point out that we do this only to determine whether it is plausible that Fornario thought that he had a colorable claim of right to use the trade name.  We analyze the three Lanham Act claims that Green ended up bringing, keeping in mind, however, that the cease and desist letters were not nearly specific enough to direct Fornario to these precise claims.

We begin with Green's § 1125(c) claim for diluting a famous mark.  In relevant part, that section provides:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

13

15 U.S.C. § 1125(c)(1). The key requirement is that the mark be famous, which the section defines as "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). This is a rigorous standard, as it extends protection only to highly distinctive marks that are well-known throughout the country. *TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 99 (2d Cir. 2001). Without going into more detail than this case requires, it seems several steps short of probable that a person with such a brief, and largely undistinguished, professional career limited to one team in one area would have a name that is "widely recognized by the general consuming public of the United States." 15 U.S.C. § 1125(c)(2)(A). Thus it appears that Fornario had a colorable defense to this claim.

We turn now to Green's § 1125(d) cybersquatting claim. That section—a relatively new addition to the Lanham Act—prohibits registering a domain name that is confusingly similar to a distinctive mark or dilutive of a famous mark with "a bad faith intent to profit" from it. 15 U.S.C. § 1125(d)(1)(A). For example, registering the site http://www.dupont.com with the hope of selling it to E.I. du Pont de Nemours and Company for an exorbitant price would be a quintessential act of cybersquatting.

To determine bad faith in this context, Congress has given us nine factors to consider:

14

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the

domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous . . . .

15 U.S.C. § 1125(d)(1)(B)(i).

Here, at least five of the nine factors appear to cut in

16

Fornario's favor. It is undisputed that he used the name Tyler Green in connection with a *bona fide* offering of services (factors III and VI). In addition, there is no evidence that he provided misleading contact information (factor VII), that he registered multiple confusing domain names (factor VIII), or that he intended to divert internet users from Tyler Green's own website (factor V). While applying the factors is a holistic, not mechanical, exercise, *see Lucas Nursery & Landscaping, Inc. v. Gross*, 359 F.3d 806, 811 (6th Cir. 2004), we have little difficulty concluding that Fornario met the low threshold of having a colorable defense to Green's cybersquatting claim.

It appears that Green's strongest claim was his § 1125(a) claim for confusing misdescription. That section prohibits using in commerce any name that is likely to cause confusion as to sponsorship of or affiliation with one's goods. 15 U.S.C. § 1125(a)(1)(A). Here, Green's claim was that Fornario's use of his name created the false impression that he was affiliated with, or otherwise approved of or sponsored, Fornario's business. Given the evidence of Green's name recognition, we believe that he would have had a good chance of succeeding on this claim, as it is sensible to think that using the name of a regionally known sports player in connection with a company that hosts events at sports bars in that region would deceive people.

At the same time, likelihood of confusion is a factual issue, and we will not presume to know what evidence Fornario

17

could have produced had he found it prudent to continue litigating the case. *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 207 (3d Cir. 2000) (noting that likelihood of confusion is an issue of fact). His business activities appear to have little to do with baseball.[6] Moreover, it is unclear just how well-recognized, even regionally, Green was when Fornario acted. So the evidence produced at discovery would be key. While possible, we are not convinced that it is even probable that a retired player, with a career neither long nor notable, would be well-known enough to render use of his name in connection with a party and event-planning business confusing to the typical consumer.[7] Indeed, it is plausible that Fornario's use of Tyler Green's name confused few consumers. Thus, once again we cannot conclude that Fornario lacked a colorable defense.

---

[6] It is not clear from the record whether Fornario's one-day handicapping business provided information on baseball games. There is nothing in the record suggesting that the entertainment company had anything to do with baseball. Rather, the only sport mentioned is football.

[7] Here it is worth remembering that the primary purpose of § 1125(a) is not to protect people (like Tyler Green) from having their names used by others, but to protect *consumers* from peddlers who use confusing, misdescriptive trade names. *See Island Insteel Sys., Inc. v. Waters*, 296 F.3d 200, 209 (3d Cir. 2004). Thus, the "touchstone" of a § 1125(a) claim is likelihood of confusion. *Id.* at 204.

We do not know precisely why Fornario agreed to stop using the name Tyler Green Sports so quickly. Likelihood of success almost certainly went into the thought process, but, as the District Court noted, Fornario probably also considered the financial position of his business (precarious) and the value of the trade name (minimal). Deciding to forgo costly litigation struck the District Court as a reasonable strategic decision, and we agree. In any event, given that Fornario met the low bar of a colorable claim to use the name Tyler Green Sports, it was reasonable for the District Court not to infer bad faith from his refusal to stop at Green's request. If anything, by settling quickly Fornario saved Green (who, we note, does not press a claim for damages) a great deal of trouble, and we are loathe to discourage such decisions by using them to support an inference of culpable conduct. Thus, we cannot conclude that the Distirct Court clearly erred in declining to find that Fornario refused to heed Green's cease and desist letters in bad faith.

\*  \*  \*  \*  \*

Green argues that Fornario knowingly sought to profit from Tyler Green's name recognition. But the District Court found that Fornario did not know of Green when he began using the trade name Tyler Green Sports, and that finding (no matter our doubts) is not clearly erroneous. In addition, Green argues in effect that upon receiving the first cease and desist letter, Fornario immediately should have set off for Canossa. We cannot agree. If Fornario maintained a good-faith belief that he

19

was rightfully using the trade name Tyler Green Sports, he was entitled to decline pre-litigation requests and defend his position as he saw fit. The District Court found that the evidence did not support a finding of bad faith, and that determination also is not clearly erroneous. Thus, we affirm the Court's conclusion that this case is not "exceptional" enough to merit an award of attorneys' fees to Green.