[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 694 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 695 
Classroomdirect.com, LLC ("Classroom Direct"), obtained a jury verdict in its favor and against Draphix, LLC, in its claims brought pursuant to the Lanham Trademark Act,15 U.S.C. § 1051 et seq. ("the Lanham Act"). In addition to the compensatory damages awarded by the jury, the trial court exercised its prerogative to award additional compensatory damages postjudgment pursuant to authority conferred on it by the Lanham Act. Classroom Direct appeals from those aspects of the trial court's postjudgment order granting it less injunctive relief than it had sought, denying its motion for attorney fees, and awarding it only one-half of the costs in this action. Draphix, formerly known as Re-Print/Draphix, LLC, cross-appeals from that aspect of the trial court's postjudgment order awarding additional damages to Classroom Direct pursuant to the Lanham Act. We affirm.
 I. Factual Background and Procedural History
Classroom Direct and its predecessor companies, the Re-Print Corporation and Re-Print LLC, sell and distribute educational and school supplies. The Re-Print Corporation began selling architectural and engineering supplies under the name "Re-Print" in 1921, eventually becoming a family business operated by Don Pate and his children. In 1988, Don Pate's son, Ray Pate, assumed control of the business. In 1992, the corporation also began selling educational and school supplies through direct-mail catalogs under the name Re-Print. Re-Print Corporation later reorganized and changed its name to Re-Print LLC. Re-Print LLC hired Jack Womack as its chief financial officer in 1993. In 1994, the company *Page 696 
employed Don Pate's daughter, Celita Carmichael, who was also employed as an elementary-school teacher, as the spokesperson for the school-supply business. In 1996, the Pate family sold Re-Print LLC to an out-of-state corporation. In late 1998, Re-Print LLC began selling its line of educational and school supplies under the name Classroom Direct. Re-Print LLC changed its name to Classroomdirect.com, LLC, in 1999; however, its educational- and school-supply catalogs continued to bear the name "Re-Print" for several years. Classroom Direct markets its products by direct-mail catalog and Internet Web site to customers on a national basis, most of whom are teachers in grades pre-kindergarten to sixth and school districts that order supplies requested by teachers. The corporation continued to sell architectural and engineering supplies under the name Re-Print until 2001. At that time, Ray Pate was asked to step down as president, and Carmichael was discharged as spokesperson. Carmichael's discharge activated a two-year noncompetition clause in her employment agreement with Classroom Direct. Womack was promoted to general manager, but he refused to sign a noncompetition agreement, declining an offer of stock options by refusing.
In July 2001, Kneeland Wright, a former employee of Classroom Direct, formed Re-Print/Draphix, LLC, and purchased certain assets from Classroom Direct. Classroom Direct sold its architectural- and engineering-supply business to Re-Print/Draphix pursuant to an asset-purchase agreement and a service-mark agreement, under which Classroom Direct licensed to Re-Print/Draphix the use of the Re-Print service mark in connection with the sale of architectural and engineering supplies. The service-mark agreement prohibited Re-Print/Draphix from using the Re-Print service mark in connection with any sales in the educational- and school-supply market. From July 2001 to July 2004, Classroom Direct's employees assisted Re-Print/Draphix with accounting, catalog production, and computer services.
In early 2004, Womack, while in the employ of Classroom Direct, ordered Classroom Direct's information-technology manager, Jeff Cabaniss, to reserve the Internet domain name "www.teacherdirect.net" on behalf of Classroom Direct. In April 2004, Wright, acting on behalf of Re-Print/Draphix, contacted a trademark attorney about registering a trademark for the name "Teacher Direct." Between April and July 2004, Cabaniss prepared a report at Womack's instruction of Classroom Direct's best-selling items. The 300-page report showed that of the 13,615 school-supply items in Classroom Direct's inventory, 90% of the company's sales revenue was derived from only 3,590 items (26% of the total inventory). In addition to providing detailed information about Classroom Direct's best-selling items, the report also showed the type and quantity of warehouse equipment that would be needed to stock a warehouse with these items.
In July 2004, Womack left Classroom Direct to become Wright's partner at Re-Print/Draphix, taking with him a paper copy of the report prepared by Cabaniss. At that time, Womack informed his superiors at Classroom Direct that he intended to start a competing school-supply catalog sales business at Re-Print/Draphix. In July 2004, Re-Print/Draphix's trademark attorney filed an application with the United States Patent and Trademark Office for the registration of "Teacher Direct" as a trademark for the fledgling school-supply division of Re-Print/Draphix. In August 2004, Womack requested that Cabaniss send him an electronic copy of the report *Page 697 
concerning Classroom Direct's best-selling items and transfer to Re-Print/Draphix the reserved Internet domain name www.teacherdirect.net. Cabaniss refused both requests.
On August 23, 2004, Classroom Direct's president, John Jeffery, wrote a letter to Wright informing him that after December 31, 2004, Classroom Direct would no longer provide the various services it had been assisting Re-Print/Draphix (hereinafter referred to as "Teacher Direct") with, including computer services, and that Teacher Direct should "aggressively begin the process of looking for another solution for its information systems needs." Jeffery's letter stated that the services of all Classroom Direct employees were no longer available to Teacher Direct.
 "[T]here have been some functions performed by Classroom Direct personnel in the past that should cease immediately. Classroom Direct associates will no longer be able to provide any service in kind or otherwise to Re-Print/Draphix. This includes, but [is] not limited to[,] accounting functions, month-end processing, custom reporting, catalog production, website design, graphic arts, etc. Please take the appropriate steps now to take over these functions because they will no longer be done by a Classroom Direct associate either during normal business hours or after hours on the associate's own time."
Jeffery also informed Wright that Classroom Direct's employees were "not able to perform any work on your new systems" because that "would constitute a conflict of interest on their part and would be grounds for termination." Nevertheless, from November 2004 to January 2005, Teacher Direct paid Larry Riley, who was employed at that time by Classroom Direct, to create the first Teacher Direct catalog and to build Teacher Direct's Web site. Riley performed this work from his home at night. Shortly after the first Teacher Direct catalog was published, Riley left Classroom Direct to work for Teacher Direct.
In February 2005, Teacher Direct published its first catalog and mailed it to approximately 300,000 teachers nationwide. Despite the fact that Teacher Direct was a newcomer to the school-supply business, the cover of the first Teacher Direct catalog stated in large, bold type: "We're Baaack." The cover prominently displayed Carmichael, the former spokesperson for Classroom Direct, using a distinctive pointing gesture with her thumb and forefinger at a 90-degree angle, a gesture she had used previously on Classroom Direct's catalogs. The inside cover page contained the following message from Carmichael:
 "`Crazy Days' are here again, and we are back and better than ever!
 "Several years ago we sold our Company. I resumed teaching full time and discovered first hand that value, selection, and service are of primary importance in choosing a supplier. . . ."
The message was signed "Celita P. Carmichael" as "president." Classroom Direct's catalogs had also referred to Carmichael as the "president" of its school-supply division. The term "Crazy" had appeared in Classroom Direct's catalogs in which Carmichael was its spokesperson using the slogan "Carmichael's Crazys" to advertise special bargain prices. The table of contents of the Teacher Direct catalog was organized with almost identical section headings arranged in the same order and highlighted in the same colors as the table of contents in Classroom Direct catalogs. The Teacher Direct catalog also used the same system of numbering catalog items as the Classroom Direct catalogs used, a three-digit numeric prefix identifying the *Page 698 
catalog number, followed by the item number for a specific product, except that Teacher Direct began its three-digit prefix with the number "3" instead of the number "1" used by Classroom Direct.
In March 2005, Classroom Direct began receiving orders by telephone and mail from customers that indicated confusion between Classroom Direct and Teacher Direct. On March 24, 2005, Classroom Direct's counsel wrote a letter to Teacher Direct concerning the customer confusion, which Classroom Direct claimed resulted from the Teacher Direct catalog. The letter demanded that Teacher Direct stop using the Teacher Direct name and that it change other aspects of its catalog.
In April 2005, Teacher Direct mailed its second catalog. The second catalog featured a banner in the upper left corner of the cover page that declared a "Grand Re-Opening." The cover page also stated that Teacher Direct had "[o]ver a decade of experience working for you" and announced telephone and facsimile numbers that were described as "new," although they were the same as the numbers printed on the February 2005 catalog cover. The other similarities to the Classroom Direct catalogs were retained in the April 2005 Teacher Direct catalog, including prominently featuring Carmichael's distinctive hand gesture. By this time, both companies began to receive orders combining items from both the Classroom Direct and Teacher Direct catalogs. Some orders also bore the "Re-Print" trademark name, further confusing the identity of the companies.
On April 25, 2005, Classroom Direct sued Teacher Direct in the United States District Court for the Northern District of Alabama, alleging that Teacher Direct had engaged in unfair competition in violation of § 1125(a) of the Lanham Act by adopting marketing and business practices that had caused, and were likely to continue causing, confusion or mistake among customers. In May 2005, the parties mediated the case, and on June 3, 2005, the parties reached a settlement, which was presented to the United States District Court. According to the settlement, Teacher Direct represented and warranted that it had not "received any orders (whether or not filled) that bear any information indicating the order was directed to or intended for CLASSROOM DIRECT." The settlement agreement also provided that Classroom Direct would inform Teacher Direct of orders it received that bore some indication they were for Teacher Direct. On July 1, 2005, the parties executed the settlement agreement. It further provided:
 "TEACHER DIRECT will not use in any future mailing, marketing or sales literature, including without limitation any websites, the pointing gesture (thumb and forefinger extended) of Ms. Celita Carmichael, the statement `We're back' (or misspelled words of similar meaning such as `We're baaack' or other derivations thereof) and/or the term `crazy' (or misspelled words of similar meaning such as `Craaaazy' or other derivations thereof) in connection with any offering with which Ms. Carmichael's name or image is used."
In late July 2005, Teacher Direct published its third catalog, a back-to-school catalog. Although Carmichael appeared on the cover, the hand gesture was changed to a "thumbs-up" rather than a pointing gesture. The back-to-school catalog contained on the inside front cover what the parties refer to as a "thumbnail" reproduction of the cover of the initial Teacher Direct catalog depicting Carmichael using the distinctive thumb and forefinger pointing gesture and the statement "We're Baaack." The back-to-school catalog *Page 699 
was mailed to twice as many educators as the initial catalog, and the purpose of the thumbnail reproduction of the initial catalog was to invite new customers to order a free copy of its initial catalog.
In August 2005, Classroom Direct sued Teacher Direct in the Jefferson Circuit Court, alleging that Teacher Direct breached the settlement agreement when it published its back-to-school catalog using certain images and phrases it had agreed to discontinue using. Teacher Direct then filed a counterclaim against Classroom Direct, alleging that Classroom Direct breached the settlement agreement when it did not produce all the orders it had received that indicated they were for Teacher Direct or that were attempting to order items from the catalogs of both companies, and alleging tortious interference with Teacher Direct's business relations by processing orders intended for Teacher Direct. In October 2005, Classroom Direct discovered that one of its employees, Kim Burch, had been e-mailing company reports revealing detailed financial information to a friend who was employed at Teacher Direct. The record reflects that these e-mails were forwarded to Womack, although he testified that he deleted them once he realized what they were. Classroom Direct immediately discharged Burch. In December 2005, Classroom Direct discovered that Burch, who was later hired by Teacher Direct, had been intercepting customer orders that indicated a confusion between the two companies and sending them to Teacher Direct since March 2005. In January 2006, Classroom Direct amended its complaint, seeking to set aside the settlement agreement with Teacher Direct because, it alleged, Teacher Direct had fraudulently represented that it had not received any orders intended for Classroom Direct or attempting to order items from the catalogs of both companies at the time of the settlement agreement when it in fact possessed all the orders sent to it by Burch. Because both companies continued to receive orders indicating confusion as to the identity of the companies, Classroom Direct asserted a claim of unfair competition under the Lanham Act and unfair competition under Alabama common law. Finally, Classroom Direct alleged intentional interference with employment relations.
Shortly thereafter, Classroom Direct learned that Teacher Direct had been using the Re-Print service mark in the school-supply market by using its corporate name, Re-Print/Draphix, LLC, on Internal Revenue Service forms requested by school systems and by offering copies of its architectural- and engineering-supply catalogs, which properly bore the name Re-Print/Draphix, in connection with the educational- and school-supply catalogs bearing the name Teacher Direct. Classroom Direct gave Teacher Direct notice of termination of the service-mark agreement that had been executed in 2001. In response, Teacher Direct filed an amended counterclaim against Classroom Direct alleging that Classroom Direct had breached the service-mark agreement in bad faith and seeking a judgment declaring that its use of its corporate name was not a breach of the service-mark agreement. Teacher Direct later filed a second amended counterclaim against Classroom Direct alleging that Classroom Direct had breached the asset-purchase agreement by improperly terminating the service-mark agreement.
After both parties filed motions for a summary judgment, the trial court entered an order in October 2006 denying Classroom Direct's motion for a summary judgment as to its claims for rescission of the settlement agreement, fraud, and unfair competition; granting Classroom Direct's motion for a summary judgment on Teacher Direct's counterclaims; and denying *Page 700 
Teacher Direct's motion for a summary judgment on Classroom Direct's claims. The trial court also directed that Classroom Direct's claim for rescission of the settlement agreement based on the alleged fraud of Teacher Direct would be bifurcated from the other remaining claims and decided after the jury had returned a verdict on those other claims.
The case proceeded to a jury trial on Classroom Direct's claims of unfair competition pursuant to the Lanham Act, fraud, and intentional interference with employment relations. After several days of testimony, the jury returned a general verdict in favor of Classroom Direct and awarded compensatory damages of $175,000. The jury returned a special interrogatory allocating $150,000 of the damages award to Classroom Direct's unfair-competition claim. After the trial court entered a judgment on the jury verdict, Classroom Direct filed postjudgment motions seeking a permanent injunction, additional monetary relief, and attorney fees and costs. After a hearing, the trial court entered an injunction prohibiting certain specified conduct by Teacher Direct and requiring a prominent disclaimer on all catalogs, Web sites, and order forms for five years, but allowed the continued use of the name Teacher Direct and of Carmichael's name and image as the spokesperson for Teacher Direct. The trial court granted Classroom Direct's motion for additional monetary relief, awarding an additional $269,758 in damages to the $150,000 awarded by the jury on the Lanham Act claim for a total award of $419,758 on the Lanham Act claim. Added to the $25,000 in damages awarded by the jury not attributable to the Lanham Act claim, the total compensatory-damages award was $444,758. Finally, the trial court denied the motion for attorney fees and awarded one-half of the costs of the proceeding to Classroom Direct.
Classroom Direct then filed a motion seeking disposition of its remaining claim for rescission of the settlement agreement. The trial court granted the motion and rescinded the settlement agreement. Classroom Direct then appealed from those aspects of the trial court's post-judgment order only granting partially its motion for an injunction, denying its motion for attorney fees, and awarding it only one-half of the costs. Teacher Direct cross-appealed from that aspect of the trial court's order awarding additional monetary relief to Classroom Direct pursuant to the Lanham Act.
 II. Classroom Direct's Appeal (no. 1060739) A. Injunctive Relief
We first address Classroom Direct's argument that the trial court tailored its injunction too narrowly to afford Classroom Direct the more sweeping relief it argues is necessary to prevent continued unfair competition by Teacher Direct. We note that the issue whether Teacher Direct violated the Lanham Act is not before us in this case. The jury decided that issue in favor of Classroom Direct and adversely to Teacher Direct, and Teacher Direct did not raise that issue in its cross-appeal.
 1. Standard of review
Classroom Direct argues that this Court applies a de novo standard of review to a trial court's entry of a permanent injunction, relying upon Weeks v. Wolf Creek Industries,Inc., 941 So.2d 263, 271 (Ala. 2006):
 "`The applicable standard of review [of injunctive relief] depends on whether the trial court entered a preliminary injunction or a permanent injunction. A preliminary injunction is reviewed under an abuse-of-discretion standard, whereas a permanent injunction is reviewed de novo.' TFT, Inc. v. Warning Sys., Inc., *Page 701 751 So.2d 1238, 1241-42 (Ala. 1999); see also Smith v. Madison County Comm'n, 658 So.2d 422, 423 n. 1 (Ala. 1995)."
Nevertheless, this Court has noted that a trial court's consideration of ore tenus testimony has a bearing upon the standard of review we apply to the entry of a permanent injunction. Here, the trial court considered ore tenus testimony at the hearing on the postjudgment motions filed by Classroom Direct.
"The trial court entered a permanent injunction, and we reviewde novo the entry of a permanent injunction. TFT,Inc. v. Warning Sys., Inc., 751 So.2d 1238, 1241
(Ala. 1999). However, the trial court also conducted a bench trial at which evidence was presented ore tenus.
 "`Where evidence is presented to the trial court ore tenus, a presumption of correctness exists as to the court's conclusions on issues of fact; its determination will not be disturbed unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. However, when the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court's judgment.'
 "American Petroleum Equip. Constr., Inc. v. Fancher, 708 So.2d 129, 132 (Ala. 1997) (citations omitted)."
Collins v. Rodgers, 938 So.2d 379, 384 (Ala. 2006).
Cases from the United States Court of Appeals for the Eleventh Circuit reflect that the federal courts apply an abuse-of-discretion standard of review, which this Court now refers to as whether the trial court has exceeded its discretion, [1] to the entry of a permanent injunction in a case brought pursuant to the Lanham Act. See, e.g.,Aronowitz v. Health-Chem Corp., 513 F.3d 1229, 1241-42
(11th Cir. 2008):
 "Finally, in connection with the trademark infringement claim, Aronowitz challenges the breadth of the permanent injunction imposed by the district court as part of its Amended Final Judgment. We review the issuance of permanent injunctions for abuse of discretion. Simmons v. Conger, 86 F.3d 1080, 1085 (11th Cir. 1996). Federal courts may grant permanent injunctions where infringement is found to have occurred in order to prevent further infringing use of a mark, and such injunctions should be designed to keep the former infringers `a safe distance away' from the protected mark. See Howard Johnson Co. v. Khimani, 892 F.2d 1512, 1517 (11th Cir. 1990)."
Although this Court has not found a United States Supreme Court case discussing the standard of review to be applied specifically to a permanent injunction entered in a Lanham Act case, we note the discussion in eBay Inc. v. MercExchange,L.L.C., 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641
(2006), relied upon by Teacher Direct, a case reviewing a violation of the Patent Act, 35 U.S.C. § 1 et seq.:
 "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering *Page 702 
the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. See, e.g., Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-313 (1982); Amoco Production Co. v. Gambell, 480 U.S. 531, 542 (1987). The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion. See, e.g., Romero-Barcelo, 456 U.S. at 320."
The United States Court of Appeals for the Sixth Circuit, in a case arising under the Copyright Act, 17 U.S.C. §§ 502, 503, broke the issues down as follows: "When a district court grants a permanent injunction, this court reviews its factual findings for clear error, legal conclusions de novo, and the scope of injunctive relief for an abuse of discretion." BridgeportMusic, Inc. v. Justin Combs Publ'g, 507 F.3d 470, 492 (6th Cir. 2007). Because we are reviewing the entry of a permanent injunction entered on a Lanham Act claim, we conclude that it is appropriate to review the issue here presented as to the scope of the injunction for an excess of discretion, especially in view of the fact that the trial court based its findings of fact that led to the crafting of the injunction upon the verdict in favor of Classroom Direct after a lengthy trial and after considering ore tenus evidence during the hearing on the postjudgment motions.
 2. Analysis
In order to obtain a permanent injunction, Classroom Direct was required to prove the following elements:
 "To be entitled to a permanent injunction, a plaintiff must demonstrate success on the merits, a substantial threat of irreparable injury if the injunction is not granted, that the threatened injury to the plaintiff outweighs the harm the injunction may cause the defendant, and that granting the injunction will not disserve the public interest. Clark Constr. Co. v. Pena, 930 F.Supp. 1470 (M.D.Ala. 1996). The elements required for a preliminary injunction and the elements required for a permanent injunction are substantially similar, except that the movant must prevail on the merits in order to obtain a permanent injunction, while the movant need only show a likelihood of success on the merits in order to obtain a preliminary injunction. Pryor v. Reno, 998 F.Supp. 1317 (M.D.Ala. 1998)."
TFT, Inc. v. Warning Sys., Inc., 751 So.2d 1238, 1242
(Ala. 1999).
The trial court's order stated the following as to injunctive relief:
 "In regard to the Motion for Permanent Injunction, the Court considered the elements necessary to issue a permanent injunction, namely, a plaintiff must demonstrate success on the merits, a substantial threat of irreparable injury if the injunction is not granted, that the threatened injury to the plaintiff outweighs the harm the injunction may cause the defendant, and that granting the injunction will not disserve the public interest. In addition, it is mindful that injunctive relief is an extraordinary remedy and as such should not be lightly granted. Classroom Direct demonstrated a likelihood of success on the merits and that without some relief it may suffer irreparable injury. However, a sweeping permanent injunction such as requested by Classroom Direct seems to outweigh the harm that it would cause Teacher Direct. There was evidence that such an injunction may force Teacher Direct and its owners into bankruptcy. *Page 703 
 "Accordingly, the plaintiff's Motion for Permanent Injunction is PARTIALLY GRANTED and PARTIALLY DENIED as follows:
 "(a) RePrint/Draphix is allowed to continue to use the name Teacher Direct, provided that it shall cause to be placed on the front cover of every catalog issued hereafter a disclaimer, declaring in bold, plain language and prominently displayed, a statement to the effect that it is not, nor [are] any of its employees or spokespersons affiliated or connected in any way whatsoever with Classroom Direct and is, in fact, a direct competitor of Classroom Direct. A similar disclaimer shall be placed upon all purchase orders or websites. The Court understands that the catalog proposed to be mailed in January, 2007, has already been purchased and/or printed. Therefore Re-Print/Draphix shall cause to be placed on the cover of each catalog a sticker containing the above disclaimer. All future catalogs shall include the disclaimer as a part of the front cover of each catalog for a period of five (5) years.
 "(b) Re-Print/Draphix may not use the words `Crazy'; `We're back' (including any variation of the spelling of `We're back,' such as `We're baaaaack'); `Grand re-Opening'; `Sold Our Business'; `Original Discount School Supply,' or `recently sold our business,' in any mailing, marketing or sales literature (including, without limitation, catalogs); and
 "(c) Re-Print/Draphix may not use the `signature hand gesture'; which means that Re-Print/Draphix may not depict any spokesperson with that person's thumb and index finger extended, in any mailing, marketing or sales literature (including, without limitation, catalogs).
 "(d) The internet address Teacherdirect.com; the name and likeness of Celita Carmichael, and the three-digit code may continue to be used by Re-Print/Draphix as there was little evidence of confusion resulting from these items.
 "(e) Re-Print/Draphix is prohibited from using the word RE-PRINT in any connection regarding the school supply business including catalogs, websites, purchase orders or any similar use."
(Capitalization in original.)
Classroom Direct first argues that it is entitled to an injunction that fully protects it from Teacher Direct's unfair competition. Classroom Direct objects to the trial court's allowing Teacher Direct to continue using the name "Teacher Direct" in the educational- and school-supply business and to continue using Carmichael as its spokesperson. Classroom Direct insists that the injunctive relief granted by the trial court merely prohibited Teacher Direct from using the competitive elements that it had already discontinued and that, therefore, the injunction did not grant "effective" relief. Classroom Direct maintains that it is entitled to an injunction that completely bars Teacher Direct from continuing to "confuse" consumers and continuing to profit from having stolen Classroom Direct's business goodwill. Classroom Direct relies upon cases such as Cumulus Media, Inc. v. Clear Channel Communications,Inc., 304 F.3d 1167, 1179 (11th Cir. 2002) ("`"[A] competitive business, once convicted of unfair competition in a given particular, should thereafter be required to keep asafe distance away from the margin line — even if that requirement involves a handicap as compared with those who have not disqualified themselves."`" (quoting Chevron Chem.Co. v. Voluntary Purchasing Groups, Inc., 659 F.2d 695, 705
(5th Cir. October 23, 1981), *Page 704 
quoting in turn Broderick Bascom Rope Co. v.Manoff, 41 F.2d 353, 354 (6th Cir. 1930) (emphasis added inCumulus Media))).
Teacher Direct argues that the trial court properly tailored the injunctive relief to the evidence presented in this case. Teacher Direct points to testimony that the "Teacher Direct" trademark is considered to have weak "brand" identification. The trademark attorney who applied for the registration of "Teacher Direct" as a trademark for Draphix's school-supply division testified that many company names contained the word "direct." He stated: "[D]irect is a very common word used in connection with direct mail, direct sending of goods to the ultimate consumer, the direct offering of things. It's used quite widely in commerce." Teacher Direct admits in its brief only that "there are some similarities between the catalogs" and cites the testimony of its marketing expert, who stated that in his opinion the catalogs of the two companies looked "nothing alike." Teacher Direct also downplays its use of Carmichael as its spokesperson, contending that she "looks strikingly different in the Teacher Direct catalog" than she looked in the Classroom Direct catalogs and citing its marketing expert's testimony that a customer survey showed that the company spokesperson was the least important factor in a teacher's decision to purchase supplies from a particular company.
After reviewing the voluminous record in this case, especially the various catalogs of the two companies, this Court sees a distinct similarity between the design of Teacher Direct's 2005 catalogs and the design of Classroom Direct's 2005 catalogs that cannot have been accidental or coincidental. In addition to the similar design, phrases such as "sold our company," "we're back," "grand reopening," "crazy days," and "new" telephone and facsimile numbers implied that Classroom Direct and Teacher Direct were, if not the same company back in business after a sale, then, at the least, related companies. As a result of legal action, Teacher Direct eliminated these misleading phrases and included in later catalogs a disclaimer stapled to the inside front cover that stated: "As you're already aware, Teacher Direct is a new company and is not affiliated with Classroom Direct in any way." The catalog printed for distribution in January 2007 carried a small notice at the bottom of the front cover that stated: "Teacher Direct is NOT affiliated with Classroom Direct." (Capitalization in original.) That catalog, like other catalogs printed after legal action was initiated, also included a notice above the table of contents that stated: "Teacher Direct is a new company and is not affiliated with Classroom Direct. We apologize for any confusion that has occurred between the two companies. Please make sure your records reflect the correct contact information for each company." The permanent injunction issued by the trial court requires a stronger disclaimer prominently displayed in bold print that includes the statement that Teacher Direct is "a direct competitor of Classroom Direct." For those catalogs already printed but not yet mailed, the trial court required Teacher Direct to attach to those catalogs a sticker containing the disclaimer.
So far as Carmichael is concerned, she honored the noncompetition clause in her contract after Classroom Direct discharged her as its spokesperson, and we can find no reason for the trial court to have prohibited Teacher Direct from employing her as its spokesperson. The problem with using Carmichael's image initially was that Teacher Direct had her use a distinctive hand gesture she had previously used on Classroom Direct's catalogs. *Page 705 
Both Carmichael and her son were depicted in various places in Classroom Direct's catalogs for several years using the pointing gesture with the thumb and index finger at a 90-degree angle. Carmichael's hairstyle was slightly different when she appeared for the first time on the Teacher Direct 2005 catalog, but the hand gesture clearly tied her to earlier Classroom Direct catalogs. Also, she identified herself as the "president" of Teacher Direct, the same title she had used as spokesperson for Classroom Direct. After legal action was commenced, Teacher Direct placed a sticker on the front cover of its catalogs that hid Carmichael's hand but, as previously noted, included the thumbnail photograph of the initial cover on the inside front cover that still depicted Carmichael making the distinctive gesture. The photograph of Carmichael on the front and inside cover pages of the catalog printed for distribution in January 2007 reflects that she has dramatically changed her hairstyle, uses only a commonplace "thumbs-up" hand gesture, and signs her message on the inside front cover as "Celita P. Carmichael, Third Grade Teacher." We also note that she begins her message by stating: "The Teacher Direct brand, established in 2005. . . ."
In crafting the permanent injunction, the trial court prohibited Teacher Direct from using phraseology implying a relationship between Teacher Direct and Classroom Direct and from depicting Carmichael using the distinctive hand gesture identified with Classroom Direct. It also required a stronger and more prominent disclaimer for five years, clearly stating that the companies are not related and that they are, in fact, competitors. In light of the foregoing, this Court cannot say that the trial court exceeded its discretion in allowing Teacher Direct to continue to use the name "Teacher Direct" and in allowing Carmichael to continue as its spokesperson.
Classroom Direct next argues that "[t]he law does not recognize a self-imposed financial difficulty caused by knowingly continuing one's own unlawful conduct as a `hardship' that precludes injunctive relief." Classroom Direct contends that the trial court erred when it considered testimony at the postjudgment hearing from Teacher Direct's chief executive officer, Womack, that Teacher Direct had already printed the catalogs due to be mailed to customers for 2007 and that the company might face bankruptcy if it were not allowed to use the name Teacher Direct. This potential hardship is not a valid consideration, Classroom Direct argues, because, it says, Teacher Direct brought the hardship upon itself by having the catalogs printed after the jury returned the verdict against Teacher Direct finding it liable for unfair competition under the Lanham Act. Classroom Direct relies on cases such asOpticians Association of America v. Independent Opticians ofAmerica, 920 F.2d 187, 197 (3d Cir. 1990) ("By virtue of [its] recalcitrant behavior, the [defendant] can hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon itself.").
Teacher Direct argues that the seasonal nature of the school-supply business made it mandatory for Teacher Direct to proceed with printing its 2007 catalogs and that its doing so should not be a basis upon which to prohibit it from continuing to use the name Teacher Direct.
Womack testified at the postjudgment hearing that catalogs in the school-supply direct-mail business must be sent to customers in January or early February in order not to miss the primary buying season in the industry. Experts for both companies had testified at trial to the seasonality *Page 706 
of the school-supply industry. Womack testified further at the post-judgment hearing:
 "Q. . . . What would be the impact on your company if the injunction [against using the name `Teacher Direct'] was entered?
 "A. We would be totally out of business. Twenty-five people would lose their jobs, and me and my business partner would have to file personal bankruptcy.
 "Q. Why . . . would those consequences occur?
 "A. Well, I've got catalogs that already have been produced with the name Teacher Direct on it, with Celita Carmichael's image. . . . And we're trying to mail those catalogs the first week of January. If we had to change all this, there is no way I could make the January date. Just having to destroy those catalogs alone would put me out of business, because I still would have to pay for those catalogs.
 "Q. Why is it, Mr. Womack, that this January date is significant? Why not wait until February or later?
 "A. Well, the January date sets the pace for the entire season. And what happens is, the teacher's buying cycle, she places her order or she makes her purchasing decision in the months of February, March, and April. And then she submits those requisitions to the school administrators, who then process the purchase order and then submit that to the school supply companies like Teacher Direct and Classroom Direct during the summer months of that year. So we have to have our catalog there in January in order to be able to get those orders for the following summer.
 "Q. Now, what about publishing schedule? How long has this schedule been put in place?
 "A. I first got the confirmation from our printer in August of 2006.
 ". . . .
 "Q. So back in August you were planning with your printer to publish the catalog that you hoped to produce in January, obviously subject to the Court's ruling?
 "A. That's correct.
 "Q. What other deadlines were imposed at the printer at that time?
 "A. The last date to change that catalog was October 21. All of our images and pages had to be there on November 26. They had a press date of December 5, and then our mail list has to be there on December 7."
In light of the foregoing testimony, we conclude that the evidence that Teacher Direct knowingly continued unlawful conduct and thereby invited potential bankruptcy by proceeding with the printing of its 2007 catalogs after the jury had returned the verdict against it finding that it had engaged in unfair competition on November 9, 2006, was not undisputed. By early November, according to Womack, the catalog had already been designed and delivered to the printer in accordance with the commonly accepted schedule in the industry. In light of Womack's testimony and in light of our conclusion that the trial court did not exceed its discretion in allowing Teacher Direct to continue using its name and Carmichael's image, we cannot say that the trial court exceeded its discretion in considering, in fashioning injunctive relief, the potential that Teacher Direct would face bankruptcy if it were forced to operate under a new name and find a new spokesperson. *Page 707 
Finally, Classroom Direct argues that the trial court "erred in attempting to analyze the components of Teacher Directs unfair competition in isolation." Classroom Direct thus argues that the trial court erred in allowing Teacher Direct to continue using the Internet address teacherdirect.com, the three-digit numbering system in the catalog, and Carmichael's likeness because, it says, the trial court should not have analyzed each component in a vacuum to determine whether that component created a likelihood of confusion, citing, for example,Schwinn Bicycle Co. v. Ross Bicycles, Inc.,870 F.2d 1176 (7th Cir. 1989):
 "`The court need not focus on merely one facet of plaintiff's total selling "image," as in trademark law. To determine unfair competition, the court must consider the total image of plaintiff's product, package and advertising and compare this with defendant's image. If defendant's trade dress is likely to cause confusion with plaintiff's trade dress, then a finding of unfair competition is warranted.'"
870 F.2d at 1182 n. 12 (quoting 1 J. Thomas McCarthy,Trademarks and Unfair Competition § 8:1 at 282-83 (2d ed. 1984)). Classroom Direct maintains that the issue is not whether each individual component of Teacher Direct's unfair competition would create confusion by itself in a vacuum, but whether Teacher Direct was able to unfairly compete by using all the various components of its "unfair-competition scheme," in which the company name, Web site domain name, catalog numbering system, and spokesperson's likeness were all critical parts. Therefore, Classroom Direct argues, all the components of Teacher Direct's unfair competition must be enjoined.
Teacher Direct argues that "while there are some similarities between the catalogs . . . the jury's Lanham Act award of only $150,000 in damages . . . demonstrates that the jury found that these were minor infringements when the evidence as a whole was considered." Teacher Direct's principal brief at 28-29. Teacher Direct then argues that the trial court correctly issued an injunction tailored to remedy the harm supported by the evidence.
We do not agree with Classroom Direct that the trial court considered the use of the Internet domain name, the three-digit numbering system, and Carmichael's image in a vacuum. The trial court properly considered all the elements Classroom Direct was required to prove in order to be entitled to a permanent injunction: (1) Classroom Direct prevailed on the merits when the jury returned a verdict in its favor on its Lanham Act claim, (2) the testimony at the trial and at the post-judgment hearing reflected a substantial threat of irreparable injury to Classroom Direct without the injunction, (3) the threatened injury to Classroom Direct in most aspects of Teacher Direct's catalog design outweighed the harm the injunction might cause Teacher Direct, and (4) granting the injunction would serve the public interest in eliminating the confusion between the two companies. In crafting the injunction, the trial court determined that prohibiting Teacher Direct's use of its name, the Internet domain name, Carmichael as its spokesperson, and the three-digit code would likely cause more harm to Teacher Direct than any threatened injury to Classroom Direct by allowing Teacher Direct to continue to use those items.
We emphasize that the trial court tailored a remedy here by balancing the equities and by considering the potential harm to both companies and the public interest, including the potential harm to Teacher Direct's creditors in the event of a bankruptcy proceeding. This Court entrusts *Page 708 
the fashioning of injunctive relief to the discretion of this state's trial courts. In Saunders v. Florence EnamelingCo., 540 So.2d 651, 655 (Ala. 1988), this Court reviewed a permanent injunction in a case in which the defendant argued that if the trial court had applied the comparative-injury doctrine, it would not have entered the injunction.
 "The defendants conclude that, on the evidence presented, the so-called comparative injury doctrine prevented the trial judge from granting the injunction. Citing Daniels v. Chapuis, 344 So.2d 500 (Ala. 1977), they argue that the trial court was required to weigh the comparative injury to the parties and to the general public because of the grant or denial of the injunction and that the evidence showed that the injury to the plaintiff's in this case would be small compared to the injury to the defendants and the general public.
 "`It is established Alabama law that, in determining whether an injunction should issue, wide discretion is accorded the trial judge hearing the application and making the decision. . . .
 "`. . . .
 "`The "comparative injury doctrine" has been generally recognized in American jurisprudence and is but a species of the balancing of the equities principle. Thus, we adopt this doctrine for application in appropriate cases as it is set forth in 42 Am. Jur.2d, Injunctions, § 56, pp. 798, 799. (See also Restatement, Torts, § 941):
 "`"Injunctions are never granted when they are against good conscience, or productive of hardship, oppression, injustice, or public or private mischief, and it may be said to be the duty of the court whose jurisdiction is invoked to secure injunctive relief, when considering the application, to consider and weigh the relative convenience and inconvenience and the comparative injuries to the parties and to the public which would result from the granting or refusal of the injunction sought."'
"Daniels v. Chapuis, 344 So.2d 500, 503 (Ala. 1977).
 "Although we agree with the defendants that the trial judge could have properly applied the `comparative injury doctrine' in this case, we are not persuaded that he did not do so or that his order is an abuse of his discretion. To the contrary, the trial judge's order is carefully tailored to prevent only the defendants' use of the particular process in question. The order does not force the defendants to stop production, nor does it close their business. It enjoins only their production of one particular product — fluxing pipe — by one particular method. Based on our reading of the record, we hold that the trial judge did not abuse his discretion by issuing the permanent injunction."
(Footnote omitted.)
The Eleventh Circuit has also emphasized the equitable principles involved in entering appropriate injunctions in cases in which there has been a Lanham Act violation:
 "Section 34(a) of the Lanham Act directs district courts to apply traditional equitable principles when fashioning injunctive relief in trademark cases: `The several courts vested with jurisdiction of civil actions arising under this Act shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable. . . .' 15 U.S.C.A. § 1116(a) (West Supp. 1995) (emphasis added). *Page 709 
Equitable principles require consideration of the unique circumstances of each case, with due regard for flexibility, practicality, and the public interest:
 "`The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.'
"Hecht Co. v. Bowles, 321 U.S. 321, 329-30,64 S.Ct. 587, 592, 88 L.Ed. 754 (1944).
 "`In trademark cases, the scope of the injunction to be entered depends upon the manner in which plaintiff is harmed, the possible means by which that harm can be avoided, the viability of the defenses raised, and the burden that would be imposed on defendant and the potential effect on competition between the parties. . . . "The law requires that courts closely tailor injunctions to the harm that they address."'
 "4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 30.03[1] (4th ed. 1995) (quoting ALPO Petfoods v. Ralston Purina Co., 913 F.2d 958, 972 (D.C. Cir. 1990)). Therefore, we have stated that `[t]he equitable relief that is granted should be only that which is required to distinguish the two products, and no more.' B.H. Bunn Co. v. AAA Replacement Parts Co., 451 F.2d 1254, 1270 (5th Cir. 1971)."
SunAmerica Corp. v. Sun Life Assurance Co. of Canada,77 F.3d 1325, 1335-36 (11th Cir. 1996) (final emphasis added).
In light of all the testimony presented to the trial court and all the factors the trial court took into consideration before entering the injunction, we cannot say that the trial court exceeded its discretion in allowing Teacher Direct to retain the specified elements of business use and catalog design discussed above. Classroom Direct prevailed, but it was not legally entitled to an injunction that stripped Teacher Direct of its name, spokesperson, and code numbers, and essentially put Teacher Direct out of business. We conclude that the permanent injunction entered by the trial court provided effective relief to Classroom Direct from Teacher Direct's unfair competition, even though it did not award to Classroom Direct all the relief that it sought.
 B. Attorney Fees and Costs
We next address Classroom Direct's argument that the trial court erred in denying its motion for an attorney-fee award and in awarding it only one-half of the costs of this litigation.
 1. Standard of review
Although Classroom Direct acknowledges that the "typical" standard of review of an attorney-fee award is whether the trial court exceeded its discretion, citing Battle v. City ofBirmingham, 656 So.2d 344, 347 (Ala. 1995), it contends that appellate review of an attorney-fee award is de novo when the trial court applies the wrong legal standard, citing Lasterex rel. Laster v. Norfolk Southern Ry., [Ms. 1050532, January 5, 2007] ___ So.2d ___ (Ala. 2007). Classroom Direct does cite one case specifically dealing with attorney-fee awards under the Lanham Act, Securacomm Consulting, Inc. v.Securacom Inc., 224 F.3d 273, 279 (3d Cir. 2000), which states:
 "We review the District Court's determination that this is an exceptional case for abuse of discretion, `unless, of course, the district court applied the *Page 710 
wrong standard, which would be an error of law.' Ferrero U.S.A., Inc. v. Ozak Trading, Inc., 952 F.2d 44, 48 (3d Cir. 1991). Accordingly, our review of the scope and meaning of the term `exceptional' as used in § 35(a) [of the Lanham Act] is plenary, but our ultimate review of the District Court's [attorney-fee] award is for abuse of discretion."
Teacher Direct contends that we review the attorney-fee award under § 1117 of the Lanham Act to determine whether the trial court exceeded its discretion, citing St. CharlesManufacturing Co. v. Mercer, 737 F.2d 891, 894 (11th Cir. 1983) ("The award of attorney's fees [under § 1117 of the Lanham Act] is within the discretion of the district court."). Our review of the trial court's attorney-fee award under the Lanham Act is clearly under an excess-of-discretion standard.
Neither party discusses our standard of review of a ruling on an attorney fee provided for by contract, to which we apply a de novo review.
 "As long as the contractual terms are clear and unambiguous, questions of their legal effect are questions of law. Commercial Credit Corp. v. Leggett, 744 So.2d 890 (Ala. 1999). Thus, we apply a de novo review to a trial court's determination of whether a contract is ambiguous and to a trial court's determination of the legal effect of an unambiguous contract term."
Winkleblack v. Murphy, 811 So.2d 521, 525-26
(Ala. 2001). It is also a well-established principle that "[w]hen a trial court does not make specific findings of fact concerning a particular issue, an appellate court will assume that the trial court made those findings that would have been necessary to support its judgment, unless these findings would be clearly erroneous." Ex parte Byars, 794 So.2d 345, 349
(Ala. 2001).
Moreover, neither party addresses the standard of review applicable to an award of costs; however, this Court's case-law is well settled that the taxation of costs is discretionary with the trial court. See, e.g., Smith v. Smith,482 So.2d 1172, 1175 (Ala. 1985) ("The taxation of costs pursuant to [Rule 54(d), Ala. R. Civ. P.,] is generally left to the sound discretion of the trial judge."); Vulcan Oil Co. v.Gorman, 434 So.2d 760, 762 (Ala. 1983) ("[T]he taxation of costs . . . rests in the discretion of the trial judge, whose decision will not be reversed unless clear abuse is shown.").
 2. Analysis (a) Attorney fees
The trial court ordered each party to be responsible for its own attorney fees pursuant to the American rule, which does not require a losing party to pay the attorney fees of the winning party, as a general rule. However, there are exceptions to that rule. As we recently stated in City of Bessemer v.McClain, 957 So.2d 1061, 1078 (Ala. 2006): "`[A]ttorney fees may be recovered if they are provided for by statute or by contract or if they are called for by special equity. . . .'" (quoting Battle v. City of Birmingham, 656 So.2d 344,347 (Ala. 1995)).
Classroom Direct first argues that it is entitled to attorney fees by contract. The asset-purchase agreement executed by the parties in 2001 when Teacher Direct purchased the architectural- and engineering-supply business from Classroom Direct provides as follows with respect to attorney fees:
 "Litigation Costs. In the event it becomes necessary for either party to initiate litigation for the purpose of enforcing any of its rights hereunder or for the purpose of seeking damages for any violation hereof, then, in addition to all other judicial remedies that may be *Page 711 
granted, the prevailing party shall be entitled to recover reasonable attorneys' fees and all other costs that may be sustained by it in connection with such litigation."
Even though the provision regarding litigation costs appears only in the asset-purchase agreement, Classroom Direct contends that it is fully applicable to claims made under the service-mark agreement because "`two or more instruments executed contemporaneously by the same parties in reference to the same subject matter constitute one contract'" (quotingLloyd Noland Found., Inc. v. City of Fairfield HealthcareAuth., 837 So.2d 253, 267 (Ala. 2002), quoting in turnHaddox v. First Alabama Bank of Montgomery, N.A.,449 So.2d 1226, 1229 (Ala. 1984)). The service-mark agreement was an exhibit to the asset-purchase agreement and was incorporated into the asset-purchase agreement by reference, and both documents were executed on July 31, 2001; therefore, Classroom Direct concludes, the two documents constitute one contract.
Classroom Direct states that Teacher Direct, in its first amended counterclaim, alleged that Classroom Direct had committed an anticipatory bad-faith breach of the service-mark agreement by improperly terminating the agreement based on Teacher Direct's use of the "Re-Print" service mark in the school-supply market, and that in its second amended counterclaim, Teacher Direct alleged that Classroom Direct had breached the asset-purchase agreement by improperly terminating the service-mark agreement. The trial court entered a summary judgment in favor of Classroom Direct on all Teacher Direct's counterclaims. Therefore, Classroom Direct argues, because the trial court entered a judgment in its favor on Teacher Direct's claims under the asset-purchase agreement and the service-mark agreement, it was the prevailing party for purposes of determining who is responsible for litigation costs under the asset-purchase agreement and the clear, unambiguous, and binding language of that contract entitles it to attorney fees in this case. Teacher Direct argues that the trial court did not find that Classroom Direct prevailed as to Teacher Direct's counterclaims because, it argues, as the arguments in the case evolved, the trial court concluded that Teacher Direct's counterclaims were actually defenses and allowed Teacher Direct to present those defenses to the jury.
Classroom Direct did not allege a breach-of-contract claim — the case was tried on claims of unfair competition under the Lanham Act, fraud, and intentional interference with employment relations. The trial court did not expressly address in its postjudgment order Classroom Direct's argument that the litigation-costs provision in the asset-purchase agreement entitled it to attorney fees. Under the asset-purchase agreement, a determination that Classroom Direct was "the prevailing party" was a necessary factual prerequisite to Classroom Direct's entitlement to an attorney fee. Because the trial court did not award an attorney fee, we must assume that it found that Classroom Direct was not "the prevailing party," a fact necessary to support its judgment. We cannot overturn such a finding unless it was clearly erroneous. Ex parteByars, 794 So.2d at 349. Our review of this issue is therefore not de novo, because the trial court did not simply refuse to enforce an unambiguous contractual provision for an attorney fee.
Because Classroom Direct did not present a claim of breach of the asset-purchase agreement to the jury, no portion of the damages award can be attributed to an alleged breach of that agreement. In light *Page 712 
of the trial court's ruling that Teacher Direct was entitled to use its counterclaim arguments as defenses in the trial of this case, we cannot say that the trial court's implicit finding that Classroom Direct was not "the prevailing party" within the meaning of the provisions in the asset-purchase agreement awarding attorney fees to the prevailing party is clearly erroneous.
Classroom Direct also argues that it is entitled to attorney fees under the Lanham Act. Section 1117(a) of the Lanham Act states, in pertinent part, that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." Clearly, Classroom Direct was the prevailing party as to its Lanham Act claim. The question, then, is whether this case is an "exceptional" case in which the trial court should have awarded attorney fees to the prevailing party. Although the Lanham Act does not define the term "exceptional," the United States Court of Appeals for the Eleventh Circuit has stated that "the legislative history of the Act suggests that exceptional cases are those where the infringing party acts in a `malicious,' `fraudulent,' `deliberate,' or `willful' manner."Burger King Corp. v. Pilgrim's Pride Corp.,15 F.3d 166, 168 (11th Cir. 1994) (quoting H.R. Rep. No. 93-524, 93rd Cong., 1st Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 7132, 7133). Classroom Direct strenuously argues that the facts of this case compel a finding that Teacher Direct acted deliberately, willfully, and fraudulently.
Teacher Direct argues that two factors indicate that this case should not be considered an exceptional one so as to trigger an award of attorney fees under the Lanham Act. First, Teacher Direct says, the jury awarded only $150,000 in compensatory damages on Classroom Direct's Lanham Act claim, when Classroom Direct sought more than $5,000,000 in compensatory damages; second, the jury did not award punitive damages in this case, although it was asked to do so by Classroom Direct.
In Green v. Fornario, 486 F.3d 100 (3d Cir. 2007), the United States Court of Appeals for the Third Circuit stated the question we address here as follows:
 "We decide whether the District Court abused its discretion in declining to award attorneys' fees to a prevailing party in an unfair competition suit. This is a discretionary decision, and it turns on whether the Court believes that the case is, in the words of the Lanham Act, `exceptional.' In holding that the Court did not abuse its discretion here, we emphasize that the term `exceptional' is not, as the plaintiff seems to suggest, a throwaway. Rather, it calls for a district court to determine whether it finds a defendant's conduct particularly culpable — enough to alter the general American rule that parties to litigation pay their own attorneys' fees. We therefore affirm."
486 F.3d at 101. The Third Circuit then discussed a process for deciding whether to award attorney fees in a Lanham Act case that we find enlightening:
 "Determining whether a case is exceptional is a two-step process. First, the District Court must decide whether the defendant engaged in any culpable conduct. Ferrero U.S.A., Inc. v. Ozak Trading, Inc., 952 F.2d 44, 47 (3d Cir. 1991). We have listed bad faith, fraud, malice, and knowing infringement as non-exclusive examples of the sort of culpable conduct that could support a fee award. Id.; see also Securacomm Consulting, Inc. v. Securacom, Inc., 224 F.3d 273, 280 (3d Cir. 2000). Moreover, the culpable conduct may relate not only to the circumstances of the Lanham Act *Page 713 
violation, but also to the way the losing party handled himself during the litigation. Securacomm, 224 F.3d at 282. Second, if the District Court finds culpable conduct, it must decide whether the circumstances are `exceptional' enough to warrant a fee award. See Ferrero, 952 F.2d at 49 (noting that the court may consider factors other than the defendant's culpable conduct, such as the closeness of the liability question and whether the plaintiff suffered damages). In sum, a district court may not award fees without a finding of culpable conduct, but it may decline to award them despite a finding of culpable conduct based on the totality of the circumstances."
486 F.3d at 103-04 (emphasis added).
Whether this Court would find this case an "exceptional" one that would support an attorney-fee award under the Lanham Act is not the relevant inquiry here. Under the facts of this case, because that determination is discretionary with the trial court, we could affirm a decision to award a fee as well as the decision not to award a fee. Our research has failed to locate a case in which a United States Court of Appeals has reversed a trial court's decision on whether to award attorney fees in a Lanham Act case. Here, especially in light of the jury's decision to award minimal compensatory damages and no punitive damages, we cannot say that the trial court exceeded its discretion in apparently concluding that this case was not an exceptional case that would mandate an award of attorney fees under the Lanham Act.
 (b) Costs
Rule 54(d), Ala. R. Civ. P., states:
 "Except when express provision therefor is made in a statute, costs shall be allowed as of course to the prevailing party unless the court otherwise directs
Classroom Direct emphasizes that portion of Rule 54(d) stating that costs are to be allowed "as of course" to the prevailing party. It also argues that § 1117(a) of the Lanham Act "provides that a prevailing plaintiff `shall be entitled . . . subject to the principles of equity, to recover . . . the costs of the action.'"
Under either Rule 54(d) or the Lanham Act, the trial court has discretion in awarding costs. Rule 54(d) states that costs are to be allowed to the prevailing party "unless the court otherwise directs," and the award of costs pursuant to the Lanham Act is "subject to the principles of equity." As the United States Court of Appeals for the Sixth Circuit stated: "A district court has the discretion to refuse to award costs to the prevailing party when `it would be inequitable under all the circumstances in the case' to do so." Andretti v. BorlaPerformance Indus., Inc., 426 F.3d 824, 836 (6th Cir. 2005) (quoting White White, Inc. v. American Hosp. SupplyCorp., 786 F.2d 728, 730 (6th Cir. 1986) (emphasis omitted)). After considering all the facts and circumstances of this case, we cannot say that the trial court exceeded its discretion in awarding only one-half of the costs of this action to Classroom Direct.
 III. Teacher Direct's Cross-Appeal (no. 1060740)
Finally, we address Teacher Direct's argument on cross-appeal that the trial court erred in granting Classroom Direct's motion for an additional award of compensatory damages in this case pursuant to the provision of the Lanham Act (Title 15 U.S.C., § 1117) allowing such relief. In Lurzer GMBH v. AmericanShowcase, Inc., 75 F.Supp.2d 98, 103-04 (S.D.N.Y. 1998), the court described this portion of the Lanham Act as follows: *Page 714 
 "While it is increasingly clear that claims for damages or profits under the Lanham Act must first be tried to a jury even where, as here, the claim is predicated on intentional deception rather than actual confusion, cf. Dairy Queen Inc. v. Wood, 369 U.S. 469, 476-79, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); Ideal World Marketing v. Duracell, Inc., 997 F.Supp. 334, 337-40 (E.D.N.Y. 1998); Gucci America, Inc. v. Accents, 994 F.Supp. 538, 539
(S.D.N.Y. 1998) (Rakoff, J.); see generally
David W. Bargman, Right to a Jury Trial in Trademark and Copyright Cases, N.Y.L.J. May 15, 1998 at 1, the Lanham Act not only provides that a plaintiff's recovery is generally `subject to the principles of equity,' 15 U.S.C. § 1117, but also that a district court should determine whether a jury's award of profits is `inadequate or excessive' and, if so, enter judgment for `such sum as the court shall find to be just, according to the circumstances of the case.' Id. In granting this `unusual power and responsibility' to the district court, the statute both implements the broad equitable discretion generally accorded to courts in trademark matters and recognizes the occasional `danger that verdicts based on [technical trademark] formulations will do serious injustice.' Stuart v. Collins, 489 F.Supp. 827, 834 (S.D.N.Y. 1980)."
 A. Standard of Review
Teacher Direct contends in its brief that "[w]hether the trial court had authority under 15 U.S.C. § 1117(a) to increase the jury's verdict is a question of law to be reviewed denovo." Teacher Direct's principal brief at 37. However, Teacher Direct cites as authority for its contention that the trial court's award of additional damages pursuant to the Lanham Act is to be reviewed de novo only Duncan v. S.N.,907 So.2d 428, 430 (Ala. 2005) ("questions of law and the application of the law to the particular facts are reviewed denovo"); and Daniels v. East Alabama Paving, Inc.,740 So.2d 1033, 1044 (Ala. 1999) (no statutory authority upon which to invade the jury's province in awarding compensatory damages unless the verdict is flawed). Teacher Direct does not cite any cases regarding the standard of review specifically applied in Lanham Act cases, as it did in its statement of the standard of review applicable to the issues raised on appeal by Classroom Direct. Classroom Direct did not provide a statement of the standard of review as to the issue raised by Teacher Direct in its cross-appeal.
We have determined, however, that the standard of review is clear in the federal courts when the award to be reviewed is one concerning the recovery of profits by a successful party under the Lanham Act. See, e.g., Lone Star Steakhouse Saloon, Inc. v. Longhorn Steaks, Inc., 106 F.3d 355, 363
(11th Cir. 1997).
 "Under the Lanham Act, a successful party `subject to the principles of equity' may recover: `defendant's [the infringer's] profits; (2) any damages sustained by the plaintiff, and (3) the costs of the action.' 15 U.S.C. § 1117(a); See Babbit Electronics, Inc. v. Dynascan Corp., 38 F.3d 1161, 1182 (11th Cir. 1994). . . . The district court's findings of profits are questions of fact subject to the clearly erroneous standard of review. St Charles Mfg. Co. v. Mercer, 737 F.2d 891, 893 (11th Cir. 1983) (citing Boston Professional Hockey Ass'n Inc. v. Dallas Cap Emblem Mfg., Inc., 597 F.2d 71, 76 (5th Cir. 1979))."
Section 1117(a) further provides:
 "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such *Page 715 
sum as the court shall find to be just, according to the circumstances of the case."
We agree with the standard embraced by the foregoing federal courts, and, in light of the express reference to the trial court's discretion in § 1117, we therefore review the trial court's findings of profits under an inquiry as to whether its findings are so clearly erroneous as to exceed its discretion.
 B. Analysis
Teacher Direct first argues that the trial court "lacked the legal authority to increase the damages based on the law of the case as established in the jury instructions." Teacher Direct's principal brief at 65. Citing Cheairs v. Stollenwerck,232 Ala. 546, 548, 168 So. 589, 590 (1936), Teacher Direct states the basic rule of law that "as to substantive rights under the federal statutes, the federal rule obtains, while the state law governs as to matters relating to practice and procedure administrative of the federal act." Teacher Direct then acknowledges that this Court has stated that "where Congress has given a State court concurrent jurisdiction to adjudicate a federally-created cause of action, a State court should not afford, deny, or curtail recovery by an overly protective insistence upon its dominance in matters procedural."Illinois Central Gulf R.R. v. Price, 539 So.2d 202, 205
(Ala. 1988). However, Teacher Direct goes on to argue that Alabama's procedural rules nevertheless apply in this case "because Classroom Direct waived its reliance on any federal procedural rules when it did not object to jury instructions providing that the jury would be the sole factfinder on all damages." Teacher Direct's principal brief at 66-67. The jury instructions in this case, Teacher Direct says, provided that the jurors were to be the "sole and exclusive judges of the facts in the case" and that they would award "any" and "all" damages. Because Classroom Direct did not object to these charges, Teacher Direct contends that the charges became the law of the case and that, if Classroom Direct had wanted to ask for additional damages, it was required to meet the procedural requirements in Alabama for requesting an additur. Classroom Direct argues that it did not need to object to the jury instructions in order to file its motion for additional monetary recovery because the Lanham Act expressly permits a trial court to award additional profits.
In essence, Teacher Direct argues that the trial court lost the authority to adjust the jury verdict based upon Classroom Direct's failure to object to the jury instructions giving primacy to the jury as to matters of fact. Teacher Direct has cited no authority imposing upon a party the burden of objecting to a jury charge before it can access a practice expressly contemplated by the Lanham Act that gives the trial court the authority to award additional damages, as it did here. Although it is not our obligation to conduct additional research for an appellant, we note that we have found no Alabama case foreclosing a verdict-loser's right to seek a new trial based on inconsistency with the weight of the evidence when that party has failed to object to the commonplace instruction under our practice as to the authority of the jury as to questions of fact. The more sound rule is against such waiver. See Stateex rel. State Highway Commission v. Belvidere DevelopmentCo., 315 S.W.2d 781, 783-84 (Mo. 1958), in which the Supreme Court of Missouri observed:
 "Initially, plaintiff (appellant) contends the trial court delegated to the jury the authority of weighing the evidence by giving defendants' Instruction No. 6, which instruction advised in part that, `you (the jury) are the sole judges *Page 716 
of the credibility of the witnesses and of the weight of the evidence and the value you will attach to each witness's testimony. . . .'
 ". . . .
 "In giving Instruction No. 6, an instruction on the credibility of the witnesses, the trial court in the prefatory sentence we have quoted was apparently advising the jury of the jurors' trial function, vested exclusively in them, of judging the credibility of witnesses and the weight and value of the testimony. In making up their verdict it is the jurors' exclusive province to weigh the evidence introduced on the factual issues submitted to them. Of course, the trial court in giving Instruction No. 6 did not delegate or surrender to the jury or waive the trial court's discretionary power, after verdict, to grant one new trial on the ground the verdict was against the weight of the evidence. And the trial court, by this exercise of discretion, did not `reverse its position' with respect to the giving of any instruction."
(Emphasis added.)
Teacher Direct ignores the clear language of § 1117(a) that allows the trial court, in its discretion, to increaseor decrease the judgment entered if it finds that the damages award based on profits is "either inadequate or excessive." Teacher Direct's argument that Classroom Direct waived its right to ask the trial court to supplement the jury's damages award is not well-taken.
We proceed, then, to review the trial court's award of additional damages.
 "`Under the Lanham Act, damages for trademark infringement may include (1) the defendant's profits, (2) any damages sustained by the plaintiff, and (3) the cost of the action.' Ramada Inns, Inc. v. Gadsden Motel Co., 804 F.2d 1562, 1564 (11th Cir. 1986) (citing 15 U.S.C. § 1117). Further, the Lanham Act confers upon district courts `wide discretion in determining a just amount of recovery for trademark infringement.' Id. at 1564-65. Unlike in the case of future lost profits caused by breach of contract, `Lanham Act damages may be awarded even when they are not susceptible to precise calculations.' Id. at 1565."
Aronowitz v. Health-Chem Corp., 513 F.3d at 1241.
Classroom Direct argued to the trial court that the $150,000 awarded by the jury did not accomplish the mandate of the Lanham Act that the court should remove all profit or unjust enrichment associated with the unfair competition from the defendant.
 "An accounting for profits has been determined by this Court to further the congressional purpose by making infringement unprofitable, and is justified because it deprives the defendant of unjust enrichment and provides a deterrent to similar activity in the future."
Burger King Corp. v. Mason, 855 F.2d 779, 781 (11th Cir. 1988). Barry Tidwell, a certified public accountant who testified as an expert witness for Teacher Direct, calculated that Teacher Direct's net profit for the year 2006 was $246,930. In reaching that figure, Tidwell reduced Teacher Direct's net profits by $172,828, the amount of legal costs and attorney fees associated with this litigation. Classroom Direct argued to the trial court that if Teacher Direct were allowed to offset its 2006 profit by its attorney fees and costs, those fees and costs would effectively be shifted to Classroom Direct and, therefore, that the lowest figure that would accomplish the mandate of the law would be a damages award of $419,758 ($246,930 plus $172,828). The trial court granted Classroom Direct's *Page 717 
motion for additional monetary recovery, awarded an additional $269,758, and entered a judgment in favor of Classroom Direct for $444,758 ($150,000 in damages awarded by the jury attributable to the Lanham Act claim plus $269,758 in additional damages for a total of $419,758 in damages pursuant to the Lanham Act, plus the $25,000 in damages awarded by the jury attributable to other claims, for a total award of $444,758). The trial court's award is supported by Teacher Direct's own expert witness; we therefore conclude that the trial court's calculation of damages was not clearly erroneous and that the trial court was entirely within its discretion in awarding the additional damages.
 IV. Conclusion
We affirm all aspects of the trial court's postjudgment order.
1060739 — AFFIRMED.
COBB, C.J., and SEE, STUART, SMITH, PARKER, and MURDOCK, JJ., concur.
1060740 — AFFIRMED.
COBB, C.J., and SEE, STUART, SMITH, PARKER, and MURDOCK, JJ., concur.
[1] This Court now uses the phrase "exceeded its discretion" rather than the phrase "abused its discretion." The standard of review remains the same. See Kyser v. Harrison,908 So.2d 914, 918 (Ala. 2005); Ex parte Family Dollar Stores ofAlabama, Inc., 906 So.2d 892, 899 (Ala. 2005).