BOLIN, Justice.
Oak Grove Resources, LLC, and Cliffs North American Coal, LLC (hereinafter collectively referred to as “Oak Grove”), appeal from the trial court’s order in favor of a class of plaintiffs in this toxic-tort class action, finding that Oak Grove failed to satisfy the requirements of a settlement agreement between the parties and ordering the continued monitoring of air near the plaintiffs’ properties for the presence of coal dust for a period of one year.

Facts and Procedural History

On July 31, 1997, the plaintiffs[1] sued Oak Grove[2] alleging that it operated the Concord Coal Preparation Plant in a manner that caused coal dust to become airborne and to migrate to their properties, where it settled, causing them to suffer both personal injury and property damage. In October 2002, the parties entered into a settlement agreement (“the 2002 settlement agreement”); the 2002 settlement agreement provided for certain injunctive relief and the payment of attorney fees and expenses. The injunctive relief required Oak Grove to complete 14 specific remedial measures within 24 months of the execution of the 2002 settlement agreement. The 2002 settlement agreement provided the following with respect to the remedial measures:
“The remedial measures set out herein shall include the proper maintenance and upgrade of the system to facilitate the goals of eliminating or minimizing particulate matter and other airborne emissions affecting the plaintiff class. The Plaintiffs’ expert shall review the above remedial measures and shall inspect the facility, approve or suggest modifications or additional remedial measures. Should the proposed additional remedial measures not be acceptable to [Oak Grove], the parties shall present the dispute to the court. Once every six (6) months for a period of twenty-four (24) months, [Oak Grove] shall provide to plaintiffs’ expert and to the Court a report as to the status of compliance with the injunctive relief required by this Agreement. Plaintiffs’ expert may revisit the facility after receipt and review of each such report, if necessary, to confirm the status of compliance.”
The 2002 settlement agreement also provided that the trial court “shall retain exclusive jurisdiction over this controversy, the interpretation, implementation, application, and enforcement of this Settlement Agreement, the Final Judgement, and all injunctions and releases therein contained.”
Following a fairness hearing, the trial court, on October 31, 2002, entered a final order approving the 2002 settlement agreement and stating:
“The Court finds, based on the evidence presented at the Fairness Hearing and the submittals of the parties, that completion and continued performance of the Injunctive Relief set forth in the Settlement Agreement will prevent or minimize the off-site migration of particulate matter or other airborne emis *965 sions generated in the operations of [Oak Grove] at the ... Concord coal preparation plant such that any such off site migration will not be so offensive as to impair comfortable enjoyment of property or to materially interfere with the ordinary comforts of human existence.”
The trial court also expressly retained jurisdiction over the matter for the purpose of “enforcing [the] Final Judgment Order and for the purposes of exercising its equitable powers supervising [Oak Grove’s] commitments in carrying out the Settlement.”
Oak Grove implemented the remedial measures at the Concord plant following the trial court’s approval of the 2002 settlement agreement. However, the plaintiffs continued to complain that the Concord plant emitted coal dust onto their properties and that the remedial measures had not satisfactorily solved the problem. Based on the recommendation of their expert, the plaintiffs argued that the injunc-tive relief contained in the 2002 settlement agreement should be modified and that additional remedial measures should be taken in order to facilitate the goal of eliminating or minimizing the effect of coal dust on the plaintiffs’ properties.
The plaintiffs and Oak Grove negotiated and ultimately agreed to supplement the 2002 settlement agreement to allow for certain specific additional remedial measures relating to the Concord plant. The supplemental agreement called for a one-year ambient-air-monitoring program to determine whether there was an excessive amount of coal dust migrating from the Concord plant to the plaintiffs’ properties. If the air-monitoring program showed no exceedances of predetermined levels of coal dust migrating from the plant to the plaintiffs’ properties then the parties agreed that the 2002 settlement agreement would be fulfilled and the case resolved. Specifically, the parties agreed that if the air monitoring did not establish any excee-dances, the plaintiffs would (1) release Oak Grove from any and all claims the plaintiffs would have had up to the date of Oak Grove’s dismissal; (2) be permanently enjoined from bringing claims against Oak Grove that could have been asserted in this action; and (3) jointly submit with Oak Grove a proposed order stating that Oak Grove had fully complied with the 2002 settlement agreement. If, however, the air-monitoring program showed excee-dances, the plaintiffs would be allowed to petition the trial court for a determination as to whether further remedial measures were necessary. On December 11, 2008, the trial court entered an order approving the parties’ supplemental agreement (“the 2008 supplement”), stating that “should there not be a successful completion of the monitoring program, then this Court retains jurisdiction to direct and supervise, consistent with the Settlement Agreement, additional remedial measures.... ”
The 2008 supplement set forth a number of extensive details regarding the air-monitoring program. The 2008 supplement provided for two air monitors to be installed — one in the Concord neighborhood near the plant (“the neighborhood site”) and one on the premises of the Concord plant between the plant and the neighborhood (“the plant site”). The 2008 supplement did not provide an exact location for the placement of the monitors but provided only that the parties and their experts would “work together in good faith to determine the exact locations for the two sites.”
The 2008 supplement established an in-depth scientific method for collecting and analyzing air samples to determine whether there was an excessive migration of coal-dust pollutants from the plant to the *966 plaintiffs’ properties. The 2008 supplement provided that a validated measurement of ambient air containing particulate matter above 150ug/m3 at the neighborhood site would be deemed an exceedance. If an exceedance occurred that was determined to be attributable to the Concord plant, then the plaintiffs’ expert was entitled to inspect the Concord plant. If two or more consecutive exceedances occurred that were attributable to the Concord plant that were not timely corrected by Oak Grove, then the plaintiffs could recommend to the trial court additional modifications or remedial measures to be implemented.
The 2008 supplement further adopted a specific air-monitoring protocol prepared by Shaw Environmental, Inc. (“the Shaw protocol”). The Shaw protocol, among other things, set forth the criteria for locating, placing, and handling the monitors used for the ambient-air testing. Section 4.4 of the Shaw protocol provides:
“[United States Environmental Protection Agency] siting criteria states that optimal placement of the sampler inlet is at breathing height [approximately 1.8 meters (6 feet) ] and that the samplers are to be placed at least 20 meters (65.6 feet) from the drip line of trees, and located away from obstacles such as buildings, so that the distance between obstacles and the samplers is at least twice the height that the obstacle protrudes above the sampler. In addition, there must be unrestricted airflow in an arc of at least 270 degrees around the sampler. For this project, the sampler locations will be selected that best meet the necessary criteria for location from obstructions and trees. Taking into account of property boundaries, access, right-of-ways, and tree lines, a ‘best-fit’ scenario will be used to site the monitors, such that each sited monitor meets the siting criteria as best as is possible considering expected limitations, such as, trees, homes, etc. The sample inlets will be located approximately 1.8 meters (6 feet) above the ground.”
The 2008 supplement also provided a multistep process by which the parties could dispute the test results of the air-monitoring program. Pursuant to this process, if neither party objected to the test results, then those results would be deemed “final and binding.” Finally, the 2008 supplement provided that Oak Grove would pay the plaintiffs attorney fees and costs incurred in the case.
Although the trial court approved the 2008 supplement, the issue of the exact locations at which to place the air monitors remained undetermined. The parties had had numerous discussions relative to this issue. In September 2008, the parties’ counsel met to discuss the location of the air monitors. Counsel for the plaintiffs recommended four potential locations for the placement of the air monitor at the neighborhood site. On October 6, 2008, counsel for Oak Grove notified the plaintiffs by electronic mail (“e-mail”) that the proposed locations for the air monitor at the neighborhood site were rejected by Oak Grove as being unsuitable because of their close proximity to trees, which violated both Environmental Protection Agency (“EPA”) criteria and the Shaw protocol. However, in that same e-mail counsel for Oak Grove proposed an alternative location for the neighborhood site in a five-acre open field. Counsel for Oak Grove stated that this proposed neighborhood site was secured by a fence and a gate; that the site was located a sufficient distance from the tree line so as to prevent obstruction of the monitor; and that the site was in the process of being purchased by Oak Grove. Oak Grove provided the *967 plaintiffs with a map of the proposed location of the neighborhood site, which did not depict any trees in the area.
On October 8, 2008, counsel for the plaintiffs responded by telephone and informed Oak Grove that he would visit the proposed alternative neighborhood site and that he “thought it would be acceptable.” On October 10, 2008, counsel for the plaintiffs notified Oak Grove by e-mail stating that, “[a]t this time, I do not have a problem with your choice of the site.”
On October 24, 2008, Oak Grove forwarded to the plaintiffs’ counsel an updated draft of the Shaw protocol, including a map, identifying a more exact location in the five-acre field where it was proposing to place the neighborhood-site air monitor. Counsel for the plaintiffs responded by email on October 28, 2008, stating that Jim Tarr, the plaintiffs’ environmental expert, “wants the off-site location in the same area but closer to the neighborhood.”[3] On October 29, 2008, the parties’ counsel met, and the plaintiffs’ counsel informed counsel for Oak Grove at that time that Tarr wanted the neighborhood site moved to the east so that it would be in a direct line with the plant site to the south and the center of the Concord neighborhood to the north.[4] On November 4, 2008, counsel for the plaintiffs reaffirmed in an e-mail to Oak Grove the request to have the neighborhood site moved, stating:
“What we want to accomplish is to have an independent contractor ... do the actual monitoring. That would include setting it up in accordance with basically what you provided me in doeu-ments, with the exception of moving the sites slightly and making sure that the [neighborhood site] will be facing in the correct direction.”
Counsel for Oak Grove consulted with Ralph Lopez, Oak Grove’s environmental manager, and Shaw Environmental in order to identify a new neighborhood site that would satisfy both the plaintiffs’ requests and the EPA criteria for air monitoring. On December 24, 2008, counsel for Oak Grove forwarded an e-mail to the plaintiffs’ counsel along with an aerial photograph prepared by Lopez depicting a new and more easterly neighborhood site. The aerial photograph depicted both the neighborhood site and the plant site, along with the natural landscape, including the tree lines. The e-mail stated:
“Here is the depiction of the approximate locations of the monitors. As you can see from the picture below, we cannot go any further east with neighborhood site because of the trees and the difficult terrain. The plant monitor and the neighborhood monitor will be in a straight line from the plant. We will proceed on this basis unless you have a question or concern.”
On January 7, 2009, counsel for the plaintiffs responded as follows:
“I can’t tell if this is what we originally agreed on after moving the original proposed site to the right[5] on the map. This one appears to have a forest in front of it. If this is what we originally discussed with our proposed move I *968 don’t have a problem but if it is something different please give me a call.”
Counsel for Oak Grove responded that same day as follows:
“We are moving it as far east as we can, as shown on the map. The ‘forest’ prevents us from going any further, and therefore it is not something different than we discussed.”[6]
A time sheet submitted to Oak Grove by the plaintiffs’ counsel indicates that the plaintiffs’ counsel visited the proposed monitoring sites on January 9, 2009. The plaintiffs’ counsel raised no objection at that time to the proposed sites. There were no further communications between the plaintiffs and Oak Grove regarding the approval of the proposed sites.
Oak Grove began construction and installation of the air monitors in January 2009. On May 28, 2009, counsel for the plaintiffs communicated with Oak Grove by letter inquiring about the progress being made on the installation of the air monitors. On June 25, 2009, Oak Grove notified the plaintiffs that air monitoring at both the neighborhood site and the plant site would begin on July 30, 2009.
In October 2009, approximately two months after testing'[7] had begun, the plaintiffs’ counsel informed Oak Grove’s counsel that he wanted to inspect the air-monitoring locations. Counsel for the plaintiffs and an investigator photographed the monitoring locations and measured the distances from the fences surrounding the monitors to the tree lines. After inspecting the air monitors, counsel for the plaintiffs objected to Oak Grove regarding the locations of the monitors, stating that the air monitors were “in the trees.”
On November 16, 2009, the plaintiffs moved the trial court to have the court inspect personally, along with the plaintiffs’ expert, the air monitors, stating that the monitors appeared to be “constructed so that inaccurate readings would result” and that the monitors were not located “in open areas where you would expect to obtain accurate readings, but are essentially hidden in the woods.” On November 18, 2009, after receiving the plaintiffs’ motion for inspection, counsel for Oak Grove informed the plaintiffs by letter that it had no opposition to the plaintiffs’ counsel and expert inspecting the air-monitoring sites. On November 20, 2009, Oak Grove responded to the plaintiffs’ motion for an inspection, stating, among other things, that the terms of the 2008 supplement allowed the plaintiffs’ expert to inspect the monitoring sites; that the plaintiffs should not now be allowed to complain about the location of the air-monitoring sites because the sites had been agreed upon by the parties after extensive negotiations; and that the motion for inspection was premature because the plaintiffs had not followed the procedures set forth in the 2008 supplement for inspecting and challenging the air-monitoring program. On December 1, 2009, the trial court conducted a hearing on the plaintiffs’ motion for inspection. During the hearing the parties agreed to allow the plaintiffs’ expert, Tarr, to inspect the air-monitoring sites.
Tarr conducted his inspection of the air-monitoring sites on January 28, 2010. On June 2, 2010, the plaintiffs’ counsel notified Oak Grove’s counsel by letter of certain concerns the plaintiffs had with the location of the air-monitoring sites. The plaintiffs stated that the air-monitoring locations violated the EPA criteria and the *969 Shaw protocol because of the close proximity of the air monitors to the tree lines. On June 25, 2010, Oak Grove responded by letter stating that the site distances for the air monitors from the tree lines were well within what is required by the EPA standards and the Shaw protocol. As of June 25, 2010, the air-monitoring results from both the plant site and the neighborhood site had indicated no exceedances of coal dust.
On June 30, 2010, the plaintiffs moved the trial court to require Oak Grove to comply with the 2002 settlement agreement and the 2008 supplement and orders of the court and further moved the trial court for additional remedial measures to ensure compliance with those agreements and court orders. The plaintiffs alleged that Oak Grove had not been in compliance with the trial court’s order to reasonably and properly monitor the alleged emission of coal dust from the Concord plant; that there needed to be additional remedial measures employed in order to enforce the trial court’s order; and that the air monitors had been placed at sites where accurate readings of the amounts of coal dust being emitted could not be obtained. The plaintiffs sought a hearing to determine whether Oak Grove had complied with the trial court’s order; requested that the trial court inspect the monitoring sites; requested that the air monitors be relocated to acceptable monitoring locations; and requested that Oak Grove be required to continue air monitoring for an additional year.
On July 12, 2010, Oak Grove responded to the plaintiffs’ motion to comply with the settlement agreements and the court’s orders and for further remedial measures, arguing that the plaintiffs should not now be allowed to object to the monitor locations after working with Oak Grove to select those locations; that the plaintiffs’ assertion that the monitors are improperly located too close to the tree lines is incorrect; and that the plaintiffs’ motion should be stricken or denied as premature, because the plaintiffs failed to object to the air-monitoring process in accordance with the detailed procedures set forth in the 2008 supplement. ■
On September 22, 2010, Oak Grove moved the trial court to enforce the 2008 supplement and to dismiss the case with prejudice, stating that the air-monitoring program had been conducted pursuant to the 2008 supplement and the Shaw protocol until August 12, 2010, with no excee-dances of coal dust being reported at the neighborhood site during the one-year monitoring period. Oak Grove argued that the plaintiffs were not entitled to further remedial measures in the form of continued air monitoring because, it said, the conditions of the 2008 supplement and the requirements of the Shaw protocol had been satisfied. Oak Grove further argued that it was entitled to a release of the plaintiffs’ claims against it and to a dismissal of those claims with prejudice.
On September 24, 2010, the plaintiffs filed a petition asking the trial court to enforce the 2002 settlement agreement and the 2008 supplement and for court intervention.[8] The plaintiffs stated that the parties agreed in the 2008 supplement that the location chosen for the neighborhood site would be a location that would give the parties and the trial court an accurate measurement of the coal dust being emitted into the commu *970 nity. The plaintiffs stated that the neighborhood site was to be a “best-fit” site that would conform to acceptable environmental standards. The plaintiffs alleged that, although they were shown the proposed location of the neighborhood site, they never actually saw the exact location chosen by Oak Grove because the air monitor at the neighborhood site was actually constructed several months after they were shown the proposed location. The plaintiffs further alleged that the neighborhood site was unacceptable because it was hidden and obstructed by trees, and they objected and demanded a relocation of the air monitor in the neighborhood site. The plaintiffs argued that Oak Grove was in breach of the 2002 settlement agreement, the 2008 supplement, and the agreement of the parties to reduce or to eliminate pollution in the Concord community. The plaintiffs sought an order from the trial court requiring the placement of additional monitoring devices in the neighborhood site for an additional 18 months.
On December 3, 2010, Oak Grove responded to the plaintiffs’ petition to enforce the settlement agreements and for court intervention, arguing, among other things, that the plaintiffs had agreed to the location of the air-monitoring sites and that the plaintiffs’ objections to the air-monitoring sites were barred by the doctrine of laches.
Following an ore tenus proceeding, the trial court, on January 14, 2011, entered an order granting the plaintiffs’ motion for compliance with the settlement agreements and their petition to enforce those settlement agreements and for court intervention. The trial court ordered additional air monitoring for a period of one year. Oak Grove appeals.

Standard of Review

This Court has stated the following with regard to the standard of review applicable in this case:
“ ‘[A] permanent injunction is reviewed de novo.’ TFT, Inc. v. Warning Sys., Inc., 751 So.2d 1238, 1241-12 (Ala.1999), overruled on other grounds by Holiday Isle, LLC v. Adkins, 12 So.3d 1173, 1176 (Ala.2008). ‘Nevertheless, this Court has noted that a trial court’s consideration of ore tenus testimony has a bearing upon the standard of review we apply to the entry of a permanent injunction.’ Classroomdirect.com, LLC v. Draphix, LLC, 992 So.2d 692, 701 (Ala.2008).
“ ‘ “Where evidence is presented to the trial court ore tenus, a presumption of correctness exists as to the court’s conclusions on issues of fact; its determination will not be disturbed unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. However, when the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court’s judgment.”
“ ‘American Petroleum Equip. & Constr., Inc. v. Fancher, 708 So.2d 129, 132 (Ala.1997) (citations omitted).’
“Collins v. Rodgers, 938 So.2d 379, 384 (Ala.2006).”
Kappa Sigma Fraternity v. Price-Williams, 40 So.3d 683, 692-93 (Ala.2009).

Discussion

Oak Grove argues, among other things, that because the plaintiffs acquiesced in the placement of the air monitors and delayed raising any objections to the locations of the monitors until after the monitors had been constructed and testing had commenced, they are barred by the doc *971 trine of laches from seeking further injunc-tive relief in the form of continued air monitoring pursuant to the 2008 supplement. The plaintiffs contend that there was no agreement between the parties as to the placement of the air monitors and that nothing in the 2008 supplement prohibits the plaintiffs from objecting to the location of a monitor either before or after initially approving a location or after testing has begun. Further, they contend that Oak Grove’s equitable-bar defense fails because, they say, they objected to the monitor locations “only a short time [two months] after” air monitoring had commenced.[9]
Oak Grove has asserted the equitable defense of laches in support of its position. This Court has stated:
“ ‘ “Laches” is defined as neglect to assert a right or a claim that, taken together with a lapse of time and other circumstances causing disadvantage or prejudice to the adverse party, operates as a bar.’ Ex parte Grubbs, 542 So.2d 927, 928 (Ala.1989) (citing Black’s Law Dictionary 787 (5th ed.1979)). It is an equitable doctrine applied by the courts to prevent a party that has delayed asserting a claim to assert that claim after some change in conditions has occurred that would make belated enforcement of the claim unjust. Ex parte Grubbs, 542 So.2d at 929. A party asserting laches as a defense is generally required to show that the plaintiff has delayed in asserting a claim, that that delay is inexcusable, and that the delay has caused the party asserting the defense undue prejudice. Id.”
Elliott v. Navistar, Inc., 65 So.3d 379, 386 (Ala.2010). Further,
“ ‘ “ ‘[l]aches, in legal significance, is not mere delay, but delay that works a disadvantage to another. So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no step to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable, and operates as es-toppel against the assertion of the right.’ ” ’ ”
Sykes v. Sykes, 262 Ala. 277, 281, 78 So.2d 273, 277 (1954) (quoting Hauser v. Foley & Co., 190 Ala. 437, 440, 67 So. 252, 253 (1914), quoting in turn other sources). Because laches is a threshold defense that we find dispositive in this case, we will address that argument first. City of Huntsville v. Stove House 5, Inc., 3 So.3d 186 (Ala.2008).
The record indicates that there were considerable communications and discussions between the parties regarding the location of the air monitor at the neighborhood site. Counsel for the plaintiffs initially recommended four potential locations for the neighborhood-site air monitor; however, Oak Grove rejected those four potential sites as unsuitable because of their close proximity to trees, a closeness that violated EPA criteria and the Shaw protocol. Oak Grove then recommended a five-acre open field as an alternative location for the neighborhood site. Oak Grove provided the plaintiffs with a map of the proposed location of the neighborhood site, which did not depict any trees in the area. Counsel for the plaintiffs informed Oak Grove that he would visit the proposed alternative site and that he “thought it *972 would be acceptable.” Subsequently, counsel for the plaintiffs notified Oak Grove that, “[a]t this time, I do not have a problem with your choice of the site.”
After receiving the above qualified confirmation from the plaintiffs that the open-field location was acceptable, Oak Grove recommended to the plaintiffs a more exact location within the five-acre field in which to place the neighborhood-site air monitor. After reviewing the more precise location recommended by Oak Grove, counsel for the plaintiffs requested that the neighborhood site be moved “closer to the neighborhood.” Shortly thereafter, the plaintiffs also requested that the neighborhood site be moved to the east so that it would be in a direct line with the plant site to the south and to the center of the Concord community to the north. On November 4, 2008, counsel for the plaintiffs reaffirmed in an e-mail to Oak Grove the request to move the neighborhood site and stated that the neighborhood site would be set up “in accordance with basically what you provided me in documents, with the exception of moving the sites slightly and making sure that the [neighborhood site] will be facing in the correct direction.” On December 24, 2008, counsel for Oak Grove forwarded an e-mail to the plaintiffs’ counsel along with an aerial photograph depicting a new and more easterly neighborhood site within the five-acre open field. The aerial photograph depicted the neighborhood site along with the natural landscape, including the tree lines. The e-mail informed the plaintiffs that Oak Grove “[could not] go any further east with neighborhood site because of the trees and the difficult terrain”; that the “plant monitor and the neighborhood monitor will be in a straight line from the plant”; and that it would “proceed on this basis unless you have a question or concern.”
The plaintiffs’ counsel then responded on January 7, 2009, to Oak Grove’s e-mail and the receipt of the aerial photograph, stating:
“I can’t tell if this is what we originally agreed on after moving the original proposed site to the right on the map. This one appears to have a forest in front of it. If this is what we originally discussed with our proposed move I don’t have a problem but if it is something different please give me a call.”
Counsel for Oak Grove responded by assuring the plaintiffs’ counsel that this was the location that had been discussed by the parties and that it was “not something different than we discussed.” Counsel for the plaintiffs visited the final proposed location for the air monitor at the neighborhood site on January 9, 2009, and raised no objection at that time to the location of the monitor.
Oak Grove began constructing and installing the air monitors shortly after the plaintiffs’ counsel visited the proposed sites and voiced no objection to the proposed locations of the monitors. The record indicates that while the air monitors were being constructed the parties communicated with each other regarding the progress of the construction of the monitors, as well as other issues. However, nothing in the record indicates that the plaintiffs’ counsel raised any objections to the location of the air monitors while the air monitors were being constructed.
On June 25, 2009, Oak Grove notified the plaintiffs that air monitoring at both the neighborhood site and the plant site would begin on July 30, 2009. The initial test results from the air-monitoring program indicated that no exceedances of coal dust were reaching the Concord community. In October 2009, two months after testing had begun, the plaintiffs’ counsel and investigator visited the monitoring lo *973 cations for the first time since January 2009 and took their first measurements of the distances between the air monitors and the tree lines. Shortly thereafter, the plaintiffs raised their first objections regarding the locations of the monitoring sites.
Tarr, the plaintiffs’ expert, did not personally visit the site locations to conduct his inspection until January 28, 2010, almost seven months after testing had begun. Following Tarr’s inspection in January 2010, the plaintiffs, on June 2, 2010, raised further objections to Oak Grove regarding the locations of the air-monitoring sites. On June 30, 2010, the plaintiffs first asserted their right under the 2008 supplement to further remedial measures in the form of continued air monitoring based on their claim that Oak Grove was not in compliance with the 2008 supplement because it had violated the terms of the supplement by locating the air-monitoring sites too close to the tree lines.
The evidence indicates that the plaintiffs were aware of the location of the air monitors in January 2009, after their counsel had viewed the proposed locations both in person and on an aerial photograph that depicted the proximity of the proposed sites to the tree lines. The plaintiffs made no objection to the location of the air monitors at this time based on their proximity to the tree lines. After much discussion and communication by the parties, including the changing of the initial specific neighborhood-site location on the five-acre tract as requested by the plaintiffs, and in reliance on the plaintiffs’ acquiescence to the site as moved to accommodate the plaintiffs, Oak Grove, at substantial expense, which included purchasing the property on which the neighborhood site was constructed, thereafter constructed and installed the air monitors at the proposed sites. At no time during the construction of the air monitors and before testing commenced did the plaintiffs raise objections to the locations of the monitors. Rather, no objection was raised by the plaintiffs to the site locations until two months after testing began in July 2009. The plaintiffs’ expert did not visit the air-monitoring sites until January 2010, after which the plaintiffs raised further objections and eventually sought in June 2010 to enforce their right to further remedial measures based on their claim that the monitoring sites were located too close to the tree lines. We conclude that the plaintiffs inexcusably delayed in asserting their rights under the 2008 supplement and that Oak Grove would be unduly prejudiced if the plaintiffs are allowed to assert those rights at this point. Elliott, supra. Accordingly, we conclude that the trial court’s judgment awarding further injunc-tive relief in the form of continued air monitoring is due to be reversed and the case remanded. Our resolution of this issue pretermits discussion of the remaining issues raised by Oak Grove.
REVERSED AND REMANDED.
MALONE, C.J., and WOODALL, STUART, PARKER, MURDOCK, SHAW, MAIN, and WISE, JJ., concur.

. The class of plaintiffs consists of property owners residing in the vicinity of the Concord Coal Preparation Plant located in the Concord community in Jefferson County.

. The plaintiffs originally named as defendants U.S. Steel Mining Company, LLC, United States Steel Corporation, and K-Lee Processing, Inc. In December 2009, Oak Grove Resources and Cliffs North American Coal were added as defendants because they succeeded U.S. Steel Mining Company as operator and owner, respectively, of the Concord Coal Preparation Plant. The originally named defendants were released pursuant to a settlement agreement.

.Tarr testified that he did not recall having any concern with the location of the neighborhood site or making any recommendations to move the proposed site. Moving the proposed site "closer to the neighborhood” would equate to moving the site north because the Concord neighborhood was located to the north of the proposed site.

. Moving the monitor site to the east would have the effect of moving the monitor closer to the tree line, but it would still conform with the distances required by the Shaw protocol.

. Moving the neighborhood site to the "right" on the map equates to moving it east.

. A considerable amount of open field lies to the northwest of the final location of the neighborhood-site air monitor.

. The initial results from the air-monitoring tests indicated no exceedances of coal dust.

. The plaintiffs adopted the allegations contained in their June 30, 2010, motion to require Oak Grove to comply with the settlement agreements and orders of the court, which was still pending before the trial court when they filed their September 24, 2010, motion.

. Although Oak Grove casts its arguments in terms of the placement of "monitors/' the briefs on appeal emphasize the location of the monitor at the neighborhood site.